(No. 38774.—)

FRITZ V. NORDINE *et al.*, Appellees, *vs.* ILLINOIS POWER COMPANY *et al.*, Appellants.

*Opinion filed March 18, 1965.—Rehearing denied May 19, 1965.*

UNDERWOOD, J., took no part.

JAMES R. DEPEW, Corporation Counsel, JOSEPH W. DEPEW, and LIVINGSTON, BARGER & BRANDT, all of Bloomington, and MAYER, FRIEDLICH, SPIESS, TIERNEY, BROWN & PLATT, and SCHIFF HARDIN WAITE DORSCHEL & BRITTON, both of Chicago, (HERBERT M. LIVINGSTON, ROBERT L. STERN, and WILLIAM T. HART, of counsel,) for appellants.

ROBINSON, FOREMAN, RAMMELKAMP, BRADNEY, & HALL, of Jacksonville, and YODER & YODER, of Blooming-

ton, (ORVILLE N. FOREMAN, WALTER A. YODER, THEODORE C. RAMMELKAMP, and JAMES W. YODER, of counsel,) for appellees.

CHAPMAN & CUTLER, and ISHAM, LINCOLN & BEALE, both of Chicago, O'HERN, ALLOY, O'HERN & WOMBACHER, of Peoria, and STEVENS, HERNDON, NAFZIGER & MOHAN, of Springfield, (JOHN N. VANDER VRIES, RICHARD G. FERGUSON, CHARLES V. O'HERN, and ELMER NAFZIGER, of counsel,) *amici curiae*.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This is an equitable action against Illinois Power Company, the city of Bloomington, and others, to restrain the sale to Illinois Power of certain personal property and real estate making up the physical properties (with minor exceptions) of the city's electric utility system. Plaintiffs are taxpayers of the city and consumers of electric energy of the system. The circuit court of McLean County allowed a motion to strike the complaint and entered judgment against the plaintiffs. The Appellate Court, Fourth Judicial District, reversed (48 Ill. App. 2d 424), and we granted leave to appeal.

Illinois Power made a preliminary proposal dated August 13, 1962, for the purchase of the entire physical properties of the city's municipally-owned electric utility for $2,500,000 and assumption of $500,000 to $525,000 in outstanding revenue bonds. The city thereafter adopted an ordinance reciting that Illinois Power had indicated a willingness to purchase the personal property of the utility for $2,250,000. The ordinance set forth the terms of a contract of sale whereby the city was to sell the physical personal property for the latter amount upon assumption of payment of $540,000 outstanding revenue bonds. A second ordinance was also adopted providing for the taking of bids and sale of the real estate upon which the generating plant was

located. The city sold the personal property upon the terms recited and sold the utility real estate to Illinois Power upon its bid of $250,000.

The physical personalty of the utility was sold under section 11—76—4 of the Illinois Municipal Code, (Ill. Rev. Stat. 1963, chap. 24, par. 11—76—4,) which provides in part: "Whenever a city * * * owns any personal property which in the opinion of three-fourths of all the corporate authorities, is no longer necessary or useful to, or for the best interests of the city or village, such a majority of all the corporate authorities, * * * by ordinance may authorize the sale of that personal property in such manner as they may designate, with or without advertising the sale, * * *." The real estate was sold under section 11—76—1 of the Code (chap. 24, par. 11—76—1), which authorizes the sale of any real estate held by a city when in the opinion of ¾ of the corporate authorities it "is no longer necessary, appropriate, required for the use of, profitable to, or for the best interests of the city * * *." The section also provides that the real estate must be advertised for bids, and while a majority of the corporate authorities is empowered to reject all bids, a bid may be accepted only by a vote of ¾. There was literal compliance with both of the foregoing sections in the consummation of the sale.

The original statute granting to a city the power to sell any real or personal property acquired or held by it for any purpose whatsoever was enacted in 1899 in substantially the form of present section 11—76—1, and was amended in 1917, placing the sale of personal property in a separate section wherein the need for competitive bidding was eliminated. The description of property which may be sold has always been very broad. In the case of personal property (sec. 11—76—4) the statute now reads, "any personal property" and as to real estate (sec. 11—76—1) it covers "any real estate [held] for any purpose whatsoever".

While conceding that this language is clear, various reasons are assigned why these broad general powers of sale are inapplicable to the sales in question.

The essence of plaintiffs' position is that when a municipality enters into the electric utility field after authorization by a referendum, it is powerless to discontinue operation and divest itself of ownership. It is argued that separate sales of the personal and real estate making up the physical property of the utility were without statutory authority and were, therefore void. It is conceded by all parties that while there is no specific statutory provision for discontinuance of service or sale of such a utility, there is likewise no specific statutory provision prohibiting discontinuance or sale.

We are in accord with the view of the Appellate Court that because the acquisition and operation of a municipal utility must receive the approval of the electorate through referendum, it does not follow that a referendum is likewise required before discontinuance and sale. Such a referendum would be directory only. We disagree however with its adoption, at least in substantial part, of the limiting effect attributable by plaintiffs to totally unrelated portions of the Municipal Code in arriving at legislative intent.

In some instances the legislature has granted a power to a municipality to commence and carry on a municipal function, subject to approval by referendum, and has provided that discontinuance of the function must likewise be subject to approval by the electorate; for example, a tuberculosis sanatarium, (Ill. Rev. Stat. 1963, chap. 24, par. 11—29—14,) a municipal band (par. 11—45—5) and public health boards (par. 11—17—9). On the other hand, the construction and operation of other facilities have been authorized subject to a referendum, but without either setting up any requirement for a referendum or providing specific authority to sell. (See *e.g.* community buildings and gymnasiums, Ill. Rev. Stat. 1963, chap. 24, par. 11—63—1 *et seq.*; coli-

seums, par. 11—66—1 *et seq.*; stadiums and athletic fields, par. 11—68—1 *et seq.*; swimming pools, par. 11—94—1 *et seq.*; airports, par. 11—101—1 *et seq.*; and municipal heating systems, par. 11—118—1 *et seq.*) The unrelated statutes thus far referred to, each found in a separate division of the Municipal Code, seem to illustrate that no fixed pattern has been adopted for discontinuance and sale of municipal facilities and contradict plaintiffs' position. In fact, several of these statutory provisions carry a definite implication of the power to sell. In the case of a coliseum a transfer of funds is authorized one year after "a municipal coliseum has been sold by the municipality", and with respect to swimming pools the municipalities "shall not sell" until either payment or provision for payment of all outstanding revenue bonds has been made. Since there was no specific power to sell within those statutes, the intent can be gathered that the general sale powers of division 76 of article 11 are applicable.

Plaintiffs direct attention to the similarity of the Municipal Ownership Act, under which this and other utilities are acquired and operated, and an act authorizing acquisition and operation of street railways by cities. The Street Railways Act, (now included in the Municipal Code as division 122 of article 11) was enacted in 1903, while the Municipal Ownership Act (now in the Code as division 117 of article 11) was adopted in 1913. Their similarity is sufficient to justify plaintiffs' statement that the latter was modeled on the former. Each provided for acquisition and operation, with the proviso that the question should first be submitted to a referendum, and neither specifically provided for discontinuance or sale. In 1933 the Street Railways Act was amended to provide for discontinuance of operation and "for the sale or disposal, in such manner as the city council may determine", but subject to approval of the electorate by referendum.

Plaintiffs argue that by the amendment the legislature

determined not only that the Street Railways Act contained within itself no power to discontinue operation and sell but also thereby determined that no other statute was available. They reason that the two acts, so closely identical and in the same general field, are *in pari materia,* and if they be considered not strictly *in pari materia* that they are sufficiently "on the same subject matter as to require consideration of both."

While these arguments have some surface appeal they will not bear close scrutiny. Street railways were becoming obsolete by 1933. In fact, there appears to have been only one municipally owned and operated street railway in Illinois, namely, Pekin. The legislature could have been concerned more with the question of discontinuance rather than sale. Whereas other types of utilities (electric power, water, gas and the like) normally would be saleable, the same was not necessarily true of street railways. If private investors were not available, discontinuance meant junking, scrapping or abandonment. Cessation of service could pose a serious transportation problem to the public and the legislature may have differentiated between street railways and other utilities because discontinuance of one probably involved the loss of service altogether, while discontinuance of the other only involved a different supplier of service. The wording of the amendment itself recognized the possibility of unsaleability by authorizing either the "sale" or "disposal" of the utility, terminology not found in other powers of sale. Furthermore, section 14 of the original Municipal Ownership Act (Laws of 1913, p. 459,) specifically provided that it should be "construed to confer powers in addition to but not limiting those now existing," although similar language was not in effect with respect to street railways at the time of the amendment. We are of the opinion that the amendment did not by implication limit the powers of utilities operating under the Municipal Ownership Act.

The next argument seems somewhat at odds with the

previous one, that is, that inferences of legislative intent should be drawn from other divisions of the Code. Plaintiffs assert that when the Code was adopted all provisions relating to the authority of an Illinois municipality to acquire and operate an electric utility were assembled in division 117 of article 11 and that the opening words of section 11—117—1, "Subject to the provisions of this Division 117 * * *" makes that division exclusive. It is then reasoned that since there is no power of sale included in division 117, power to sell cannot be derived from another division. We read no such meaning into division 117. The Illinois Municipal Code, as was its predecessor the Revised Cities and Villages Act of 1941, is a systematic rearrangement of separate statutes, passed at widely varying times, dealing in specific areas of municipal government. It does not provide wide-sweeping substantive changes. We see no significant legislative intent in the omission of the power to sell from division 117.

In summary, we have found that the sale of this municipal utility is not prohibited by statute and that such a prohibition cannot be inferred from unrelated divisions of the Municipal Code. This interpretation is substantiated by the statutory guide contained in division 9 of article 1 of the Illinois Municipal Code, (Ill. Rev. Stat. 1963, chap. 24, par. 1—9—1,) which reads: "The provisions of this Code shall be cumulative in effect and if any provision is inconsistent with another provision * * *, it shall be considered as an alternative or additional power and not as a limtitation upon any other power * * *."

Plaintiffs complain that the general sale provisions of division 76 of article 11 do not provide for a combined sale of real estate and personal property and that the offer of the defendant utility of August 13, 1962, and the acceptance by the city were for the entire system. The short answer is that that agreement is a nullity since the city council was without authority to make a sale which included real estate.

Actually, the sale of personalty was made by the adoption of the ordinance (and the execution of the form of contract included therein), and the sale of real estate was under an ordinance providing for the taking of bids and the acceptance of Illinois Power's bid by adoption of another ordinance.

We now turn to the question of whether legislative intent is manifested that the general sale powers granted to municipalities are applicable to the sale of a utility such as this. The language of the statutes under which these sales were consummated, (Ill. Rev. Stat. 1963, chap. 24, pars. 11—76—1 and 11—76—4,) is very broad. One refers to "any real estate [held] for any purpose whatsoever", and the other covers "any personal property".

The rule, not only in this State but in most jurisdictions, is that plain and unambiguous provisions of a statute do not need construction and the courts cannot read into a provision exceptions or limitations which depart from its plain meaning. (*Wall* v. *Pfanschmidt*, 265 Ill. 180; *Belfield* v. *Coop*, 8 Ill.2d 293; 82 C.J.S., Statutes, sec. 322b(2); 50 Am. Jur., Statutes, sec. 225.) The statutory language seems plain enough. If the system were only personalty or only realty, the applicability of the appropriate section seems obvious. The only question in such case would be whether specific authority to discontinue was required. To say that the power to sell is prevented by lack of specific authority to discontinue operation would in effect nullify the statute and the sale power thereunder, no matter how useless the facility became.

Orders and decisions of the Illinois Public Utilities Commission (now Illinois Commerce Commission) are public records, (Ill. Rev. Stat. 1963, chap. 111⅔, par. 8,) and as such we take judicial notice of them. (*Cf. Department of Public Welfare* v. *Bohleber*, 21 Ill.2d 587; *Gadlin* v. *Auditor of Public Accounts*, 414 Ill. 89; *Scofield* v. *Board of Education*, 411 Ill. 11.) It appears therefrom that be-

tween 1913 and 1960 at least 58 municipalities have sold municipal utility systems to private companies during all of which time the only statutory authority was division 76 of article 11 or its predecessors. The legislature undoubtedly knew of these sales and the interpretation given the general sale powers by municipal authorities. Despite the facts that 48 such sales took place between 1913 and 1941, when the provisions of present divisions 76 and 117 were reenacted, 5 were made between 1941 and 1955 when both were again reenacted, and five more between 1955 and 1961, when both were reenacted the third time (all without substantial change), the legislature never saw fit to curtail or broaden the general powers of sale of division 76. Under the construction generally given that division of article 11 the legislative intent seems apparent. *Cf. City of Champaign* v. *City of Champaign Township,* 16 Ill.2d 58.

In the alternative, plaintiffs contend that if division 76 of article 11 should be deemed to confer powers of sale of this utility and authorize discontinuance of operation, the provisions of division 76 have not been complied with. We have carefully examined the record, and repeat that the provisions of division 76 have been met literally. Furthermore, the allegations of the amended complaint, if proved, are insufficient to show such an abuse of discretion as would justify interference by the courts. We hold that the sales were valid.

For the reasons stated, the judgment of the Appellate Court is reversed, and the judgment of the circuit court of McLean County is affirmed.

*Appellate Court reversed,*
*circuit court affirmed.*

Mr. JUSTICE UNDERWOOD took no part in the consideration or decision of this case.