WILLIAM THOMAS PEARCE, Plaintiff-Appellant, *v.* ILLINOIS CENTRAL GULF RAILROAD COMPANY, Defendant-Appellee.

Fifth District   No. 79-570

Opinion filed September 25, 1980.

24

Lindholm & Williamson, of Peoria (Nile J. Williamson, of counsel), for appellant.

William J. Novick, of Fowler & Novick, of Marion, for appellee.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Plaintiff, William Thomas Pearce, brought this action for personal injuries based on a collision between his pickup truck and a train owned by defendant, Illinois Central Gulf Railroad, at about 8:15 a.m. on May 20, 1978, in Williamson County. At trial, after plaintiff had presented his case in chief, the trial court directed a verdict in defendant's favor and rendered a judgment thereon. Plaintiff appeals seeking a new trial, urging that (1) the directed verdict was improper under the standard in *Pedrick*

*v. Peoria & Eastern Railroad Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504, (2) the trial court erroneously struck portions of plaintiff's complaint, and (3) plaintiff's offer of proof of certain Illinois Commerce Commission rules was improperly denied. The trial court found in his lengthy written order that "the Court cannot say as a matter of law that plaintiff was not in the exercise of due care and caution for his own safety." But the court also found that none of the charges of negligence or wilful conduct had been proved.

Plaintiff, a coal miner, had been working the third shift at the Peabody Coal Company's Will Scarlett mine for eight months at the time of the accident. The mine could be reached by either a county road or what the witnesses referred to as a coal haulage road. Plaintiff's witnesses agreed that the majority of the mine employees used the haulage road to get to and from the mine and that the county road was very rough and at times impassable. There was no testimony as to the number of employees who worked at the mine or who used the haulage road. The haulage road ran generally east and west, the mine being at the west end. Going away from the mine to the east the haulage road curved gently and crossed two sets of railroad tracks. Defendant Illinois Central operated its trains upon the easternmost set of tracks. The two sets of tracks were estimated as being about 150 feet, or six to eight car lengths, apart. The road between them curved slightly.

The Illinois Central tracks were guarded by flashing red lights, a pair on either side of the crossing, and a bell which rang when the lights flashed. All four flashing lights were visible from either side when operating. All mine employees who testified agreed that the lights frequently became activated when no train was approaching. The witnesses also agreed that the haulage road was extremely dusty in dry weather and that the coal company watered it frequently to control the dust. However, just prior to the collision in question it had rained and the road was wet and muddy.

Steven Craig, a mine employee, testified for the plaintiff that he was driving a road grader eastbound toward the railroad crossing just prior to the accident. Pearce's truck had passed him about one-half to three-quarters of a mile from the crossing. Craig had first realized an accident had occurred when he saw Pearce's damaged pickup truck facing away from the crossing. Craig testified the grader was very loud and that he sometimes wore ear muffs because of the noise. He was not sure whether he was wearing them at the time in question, but he did not hear the crossing bell or a train whistle. The sun was up but not visible because it was behind foliage. Craig testified that the crossing could be seen at a distance of 150 yards when approaching from the west. On one prior occasion he had seen a train backing through the crossing and the flashers

were not then operating. He stated the haulage road was owned and maintained by the coal company and that the company had placed a speed limit sign thereon. At the entrance of the haulage road was a sign which stated "private" and "no trespassing."

Ellis Simpson, a longtime employee at Will Scarlett, testified for plaintiff that he was headed west on the haulage road toward the mine at the time of the accident. He did not see Pearce's truck prior to the accident. Simpson heard the train's intermittent whistle when he was about 600 yards from the crossing. When he reached the crossing the northbound train had already started across the road, the red signal lights were flashing and the bell was ringing. He had no trouble seeing the lights. The lights on the mine side were working when he finally crossed the tracks. He had no trouble seeing them. He estimated the train's speed as 45 miles per hour. He did not see Pearce's truck or know that a collision had occurred until the train slowed down. Pearce told him immediately after the accident that he had never seen the train. Pearce's truck had left straight skid marks on the road and Simpson estimated them to be 100 feet long.

Regarding the condition of the crossing, Simpson testified that the crossing was visible for 200 yards from the mine side on the haulage road. From that distance, however, little of the railroad track was visible because of foliage and a high embankment. He estimated that one would have to be 30 feet from the crossing on the west side to see the front of an oncoming northbound train. Simpson testified the coal company had placed flagmen at the crossing on at least one occasion when the crossing lights were flashing and no train had activated them. The coal company had also removed foliage near the crossing following complaints by coal company truck drivers of hindered vision. Simpson was unable to recall the extent of the foliage at the crossing at the time of the accident. Asked whether he had ever seen anyone other than coal company employees removing foliage there, he replied that he had seen railroad employees working at the crossing "quite a few times." Simpson also related that another coal company employee had been involved in a car-train accident at that crossing a few years previously and that that driver had been headed away from the mine as was Pearce. He estimated the haulage road was 15 years old.

Plaintiff testified in his own behalf that when the accident occurred the sun was just breaking through the foliage. He estimated his speed along the haulage road as 30 to 35 miles per hour, increasing when he came out of the curve before the crossing to 35 to 40 miles per hour. He did not remember hitting the train or seeing flashing lights. He was asked the following questions and gave the following answers regarding the flashing lights:

"Q. Did you look for them?

A. Uh, when you are approaching a crossing, the lights are right there, there is basically no way you could help from seeing them. But for some reason I didn't, I didn't notice them or didn't see them.

Q. Did you look for them on that day?

A. Yes. When you go—like I said, when you go into the crossing, they are there and I seen trains go over there before and the lights work, and basically not work * * *."

He testified further on cross-examination:

"Q. * * * You are not telling the jury that you looked at that flasher and it was not working, you are not telling the jury that, are you?

A. Yes.

* * *

Q. When did you look?

A. Well, when I got up there.

* * *

Q. And, uh, uh, what did you see when you looked?

A. Well, I am looking at it all the time while I am driving toward it."

Pearce testified the lights could be seen from the mine side of the crossing from several hundred feet back. The lights were always dirty, as he knew even then. He did not recall hearing anything as he approached the crossing. He did not recall whether his truck windows had been open and did not recall the noise from Steven Craig's road grader as being significant near the crossing. Pearce testified that visibility was very poor in the direction from which the train had come.

Asked what happened when the collision occurred, Pearce replied, "I was driving along and I glanced up and, well, I was just looking up, driving along, and all of a sudden there was an engine and that's the last thing I remember." He estimated the engine was two or three car lengths directly ahead of him when he first saw it. He did not know whether the engine he saw was the first one on the train.

Vincent Besherres, another Peabody employee at Will Scarlett, testified for plaintiff regarding conditions near the crossing. To the south, the direction from which the train that hit Pearce came, the track was cut into a hill. Thus, a train coming from that direction could not be seen until it was 25 to 30 feet south of the crossing, and was difficult to see from either side of the crossing. The flashing lights became "awful dirty" due to the dust on the haulage road, and he had never seen anyone clean them. When he left the mine after the third shift the crossing lights were sometimes difficult to see because of the sun above them.

Besherres testified the haulage road was generally used by mining

machinery and 100-ton haulage trucks with wheels "[y]ou can't touch the top of" and trailers "the length of this room."

Plaintiff's last witness, Kenneth Samuel, a claims agent for Illinois Central, testified under section 60 of the Civil Practice Act (Ill. Rev. Stat. 1977, ch. 110, par. 60). According to Samuel, Illinois Central contracted to have the crossing in question sprayed twice in 1978 to retard the growth of foliage. The contractor, Spray Services, Inc., agreed to a "tentative schedule" to spray Illinois Central's Metropolis-to-Bluford district including this crossing on May 10 (10 days prior to the accident) and July 4, 1978. The spraying was actually done June 1 and August 22. To Samuel's knowledge no Illinois Central employees sprayed the crossing in 1978. Samuel was unaware of what spraying or defoliating arrangements Illinois Central made with respect to that crossing for any year other than 1978.

Among plaintiff's exhibits introduced in evidence at trial were several color photographs of the accident scene showing views of the crossing from various distances and one view straight down the track in the direction from which the train which struck plaintiff had come. Plaintiff testified the photographs were taken in his presence early in August 1978, some 10 weeks after the accident, and that the foliage shown in the pictures was basically the same as at the time of the accident. Another photograph exhibit shows a hooded red crossing light, heavily encrusted (with dust, according to plaintiff's testimony), and a hand which is scraping away the encrustation. Plaintiff testified the light was always so encrusted and was so at the time of the accident.

A deposition of plaintiff's attending neurologist was read into evidence to show the extent of plaintiff's injuries. That testimony is not pertinent to the issues on appeal and need not be discussed. While the evidence indicates plaintiff's truck struck the side of the train, there was no testimony tending to show which car or engine on the train was struck.

■■ Verdicts ought to be directed only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Pedrick.*) In determining whether a verdict should be directed, the evidence and all reasonable inferences therefrom should be construed against the movant. *Pedrick.*

■■■ We note at the outset that the trial court declined to determine as a matter of law that plaintiff was guilty of contributory negligence. Defendant argues at length in its brief on appeal that the trial court's ruling in this regard was error, and that defendant was entitled to a directed verdict based on plaintiff's contributory negligence. In Illinois the plaintiff must plead and prove his own freedom from contributory

negligence to recover. (*Oszart v. Chicago & North Western Transportation Co.* (1977), 48 Ill. App. 3d 730, 363 N.E.2d 162.) Here, we cannot conclude that there was no substantial question of fact raised as to contributory negligence. The testimony adduced by plaintiff regarding the conditions surrounding the crossing was sufficient to raise a question of fact as to whether his view of the oncoming train and of the crossing lights was obstructed. Also significant in that regard was testimony by several of plaintiff's witnesses that the flashing lights frequently were activated in the absence of a train, which the trial court noted might lull a motorist into discounting the importance of the activated flashers. We find no error in the trial court's refusal to direct the verdict for defendant on the basis of plaintiff's failure to prove freedom from contributory negligence.

We turn to the issue of whether the evidence of defendant's negligence adduced by plaintiff was sufficient to present a question for the trier of fact under the standard in *Pedrick*. Plaintiff's final amended complaint charged that defendant was negligent in (1) failing to install an automatic crossbar at the crossing, (2) failing to maintain the crossing as provided by statute (Ill. Rev. Stat. 1977, ch. 114, par. 62), (3) failing to clean the red flashing lights, and (4) failing to clear the right-of-way of foliage for at least 500 feet on each side of the crossing as required by Illinois Commerce Commission General Order No. 138, Rule 205. In a separate count plaintiff charged that defendant wilfully failed to do each of the abovementioned acts. In concluding that no question of fact had been raised as to defendant's negligence, the trial court found that there was no evidence that the haulage road was not a private roadway. The issue of whether the road was public or private is of central importance to the outcome of the case since, as we have determined, the defendant railroad is under no legal duty, either statutorily or at common law, to guard or maintain a crossing for a private road. We have concluded that the finding of the trial court that the coal haulage road was a private road was correct.

Plaintiff's witnesses testified, and it is uncontradicted, that the Peabody Coal Company owned and maintained the coal haulage road for its own use and posted signs on it, including "no trespassing" signs, at the entrance. The road extended from a public highway to the Will Scarlett mine. Various witnesses answered in the negative when asked whether either the county or State maintained that road. There was no testimony that anyone other than coal company employees and other persons having business with the coal company was permitted to use the road, and no estimate was offered as to the volume of traffic thereon or as to the number of persons employed at the mine.

■■ Under the circumstances we need not determine whether the public-

private issue was a question of fact for the jury or a question of law for the trial court as we would have to do if the evidence on the point was conflicting. Since there was no evidence at all to support a contrary conclusion, it was proper for the trial court to determine as a matter of law that the haulage road was private. *Pedrick.*

Plaintiff argues that the haulage road was in effect public because (1) there was testimony that members of the public disregarded the no-trespassing signs at its entrance, and (2) there was no access to the mine at that time other than via the haulage road. We disagree. Persons disregarding no-trespassing signs would be trespassers at best, both upon the coal company's property and the railroad's, and the railroad's duty in such circumstances would be to refrain from wilful and wanton conduct that would cause injury to such persons. (*Spring v. Toledo, Peoria & Western R.R. Co.* (1976), 44 Ill. App. 3d 3, 357 N.E.2d 1330, *aff'd* (1977), 69 Ill. 2d 290, 371 N.E.2d 621.) Certainly, use in the nature of trespass could not, without more, have given rise to some new duty on the part of the railroad that would have benefitted the plaintiff.

■■■ We turn to the issue of whether any duty was imposed by statute and was breached by defendant. Defendant urges that Illinois Commerce Commission General Order No. 138 is limited by its own terms to grade crossings of public roadways. The order is not included in the record on appeal; however, orders and decisions of the Illinois Commerce Commission are public records, and as such we may take judicial notice of them. (*Nordine v. Illinois Power Co.* (1965), 32 Ill. 2d 421, 206 N.E.2d 709.) Section 1 of General Order No. 138 states that the order is "a complete revision of the requirements of the Commission with reference to crossings of railroads with *public* streets and highways in this state * * *." (Emphasis added.) In section 100, paragraph 103, the terms "street" and "highway" are defined as ways "open to the use of the public as a matter of right * * *." We note additionally, without deciding, that one might question whether the Illinois Commerce Commission is even empowered to regulate private grade crossings. (*Cf. Illinois Central R.R. Co. v. Franklin County* (1944), 387 Ill. 301, 56 N.E.2d 775; see Ill. Rev. Stat. 1977, ch. 111 2/3, par. 62.) Because plaintiff's evidence showed the haulage road was privately owned and maintained, no verdict for plaintiff based on a violation of General Order No. 138 could properly have been returned.

■■ Our analysis is similar with respect to plaintiff's claim that a question of fact existed as to defendant's liability under section 8 of "[a]n Act in relation to fencing and operating railroads" (Ill. Rev. Stat. 1977, ch. 114, par. 62), which states in pertinent part:

"Hereafter, at all of the railroad crossings *of highways and*

*streets* in this state, the several railroad corporations in this state shall construct and maintain said crossings * * * so that at all times they shall be safe as to persons and property." (Emphasis added.)

That the legislature intended to limit the application of section 8 is shown by the limiting phrase above emphasized. The Act does not expressly define "highways" or "streets." The legislature has specifically defined both words in the Illinois Vehicle Code (Ill. Rev. Stat. 1977, ch. 95½, par. 1—100 *et seq.*) as ways, *inter alia*, "publicly maintained." (Ill. Rev. Stat. 1977, ch. 95½, pars. 1—126, 1—201.) It is our impression that the Illinois Vehicle Code's definitions reflect the plain, usual and ordinary use of those words. (See Black's Law Dictionary 656 (5th ed. 1979).) We apply that meaning in interpreting the instant statute. (*Ambassador East, Inc. v. City of Chicago* (1948), 399 Ill. 359, 77 N.E.2d 803.) Accordingly, no violation of section 8 (Ill. Rev. Stat. 1977, ch. 114, par. 62) could have been found here in view of the uncontradicted testimony that the haulage road was privately owned and maintained.

Accordingly, if any duty is to be imposed upon defendant and any breach of that duty is to be established on the basis of the omissions alleged by plaintiff in his complaint, they must be predicated on the common law.

■■ ■ The use of a railroad right-of-way is exclusive, and is property. (*Illinois Central R.R. Co. v. Commissioners of Highways* (1896), 161 Ill. 247, 43 N.E. 1100.) Plaintiff in the instant case was not on the right-of-way of the railroad on railroad business or for some business that would benefit the railroad. Thus, he was not there at defendant's invitation, express or implied. At best, plaintiff had a mere license to cross defendant's right-of-way. Mere naked license to enter or pass over an estate will not create a duty or impose an obligation on the part of the owner to provide against the danger of accident. *Cunningham v. Toledo, St. Louis & Western R.R. Co.* (1913), 260 Ill. 589, 103 N.E. 594.

In *Cunningham* the issue before the court was the duty owed with respect to operation of defendant's train at a private crossing. However, the allegations in the instant final complaint all concern failure to maintain the haulage road crossing properly and to erect appropriate safety devices. *Cunningham* did not address that issue. The question of the railroad's duty regarding maintenance of the crossing itself was at issue in *Atchison, Topeka & Santa Fe R.R. Co. v. Parsons* (1891), 42 Ill. App. 93. There, plaintiff's horse was killed and his wagon damaged by defendant's train when a third party drove the team across the right-of-way at a planked farm crossing constructed by the railroad. There was some evidence that various persons used the crossing for their own convenience and that for many area residents the crossing was the shortest route into

town. Plaintiff argued that the railroad breached its duty to keep his view of the tracks clear by permitting a soil embankment and weeds to remain on the right-of-way. The court, reversing judgment on the verdict for plaintiff, held the evidence "did not make the crossing a public one, or create any new duty on the part of appellant" and stated what we believe to be the general rule applicable to the facts adduced in the instant case some 22 years before its appearance in *Cunningham*: "A mere naked license or permission to enter or pass over an estate, will not create a duty or impose an obligation on the part of the owner to provide against the danger of accident." 42 Ill. App. 93, 95.

While plaintiff apparently accepts the general rule of *Parsons* and *Cunningham* as the applicable common law standard of care at private crossings of a railroad right-of-way, plaintiff argues the railroad's duty with respect to the haulage road crossing in question should nevertheless have been that for a public crossing, urging that (1) the railroad was aware of a "constant and systematic flow" of traffic at the crossing, (2) the haulage road was no different from a rural public road near a small community, and (3) the railroad installed flashing lights and on at least two occasions had the crossing area sprayed to retard the growth of foliage.

■■ We find no evidence as to the volume of traffic on the haulage road. Despite the fact that the accident occurred while plaintiff was leaving the mine at the end of his shift, occurrence witnesses mentioned only two private vehicles (one of them the plaintiff's) and a road grader on the haulage road at the time. We need not decide whether notice on the part of the railroad of a "constant and systematic flow" of traffic as urged by plaintiff would, even at a nonpublic crossing, give rise to a duty to erect crossing gates or other safety devices. Plaintiff adduced no evidence of the extent of that traffic or the railroad's knowledge thereof. Neither was there testimony that the railroad had notice that the county road to the mine was impassible, or nearly so, requiring mine employees to enter and leave the mine on the haulage road. It was plaintiff's burden to prove defendant's notice or knowledge of the extent of the traffic, but he made no attempt to do so. See *Perminas v. Montgomery Ward & Co.* (1973), 16 Ill. App. 3d 445, 306 N.E.2d 750, *rev'd* (1975), 60 Ill. 2d 469, 328 N.E.2d 290.

Regarding the significance of the railroad's alleged installation of flashing lights, the record is silent as to who installed them and why. We are wary of making any assumption that the railroad determined the lights were needed and installed them. Counsel for the defendant asserted at oral argument before this court that the railroad erected the lights pursuant to contract with the Peabody Coal Company. While we find that assertion unsupported in the record, it illustrates the danger of baseless

assumption in that regard. Also, while it is apparent that the lights were either on the railroad's private property or that of Peabody Coal Company, the record is silent as to which one. In addition, we do not believe that the railroad, by installing one protective device (if it did so), assumed an obligation thereby to provide any other or further devices. Plaintiff cites no authority to justify a conclusion that such a duty exists.

■■ ■ We conclude that there is no common law duty to maintain the haulage road crossing of the right-of-way or to erect protective devices therefor under the facts adduced by plaintiff. As we have already concluded that there is likewise no statutory duty, we conclude that the trial court properly directed a verdict for defendant railroad under the standard enunciated in *Pedrick*.

We turn to plaintiff's contention that the trial court committed reversible error in striking from his first complaint the common law negligence allegations that defendant (1) failed to exhibit a white light on its train and (2) failed to give adequate warning of the train's approach. Defendant urges that plaintiff abandoned those allegations by filing a new and amended complaint on the morning of the trial. In addition to the above allegations, plaintiff's first complaint alleged defendant (3) failed to keep a proper lookout, (4) failed to ring a bell or blow a whistle before reaching the crossing, and (5) failed to maintain the crossing and erect proper warning devices. The trial court did not strike the latter three allegations.

Plaintiff thereafter amended his complaint by adding additional counts charging defendant with (1) failing to maintain the crossing, (2) failure to ring a bell, (3) failure to use a headlight, and (4) failure to maintain its crossing signs, all as required by statute. Allegations regarding the headlight were stricken by the trial court. Plaintiff again amended the complaint by adding another count which contained no new allegations of substance. On the day of trial, plaintiff was permitted to amend his complaint by deleting all the foregoing allegations of negligence and substituting allegations that defendant had in various ways failed to maintain the crossing and erect suitable safety devices. Although the order of the trial court striking the allegations in question states that arguments of counsel were considered, the record on appeal does not include those arguments, nor are specific grounds mentioned in the order of the court.

■■ A plaintiff who chooses to file an amended pleading usually waives all objections to the trial court's ruling in the original complaint. (*Field Surgical Associates, Ltd. v. Shadab* (1978), 59 Ill. App. 3d 991, 376 N.E.2d 660.) Plaintiff deleted from his final complaint all reference to any breach of duty on defendant's part to warn of the approach of the train, including

those allegations which were not stricken by the trial court as well as those that were. We conclude that plaintiff accordingly waived his objection to the trial court's ruling striking the allegations in question.

Even if the issue were not waived, we believe plaintiff could not have been prejudiced by the striking of the catch-all allegation that defendant "failed to give adequate warning" of the train's approach. Plaintiff suggested no specific failure to warn, either by allegation in his complaint or in his brief on appeal, other than failure to exhibit a white headlight or to sound the train's whistle or horn. Both were specifically alleged in the original complaint. Of these two alleged omissions, the former was stricken, the latter was not. If plaintiff suffered prejudice it would have been in the striking of the allegation concerning the headlight, not the striking of the catch-all allegation. In the latter ruling we find no reversible error. *Duffy v. Cortesi* (1954), 2 Ill. 2d 511, 119 N.E.2d 241.

Although we deem the issue waived, we nevertheless observe that we find no prejudicial error in the striking of the allegation concerning failure to exhibit a headlight on the train. There is no evidence that a headlight on the engine would have made the train visible any sooner, or that it would have given any additional warning of the train's approach. Plaintiff and his occurrence witnesses agreed that the accident occurred in morning daylight. Dust, normally a visibility impediment, was not a problem due to recent rain. Under those circumstances it is obvious that the alleged failure to exhibit a headlight on the train could not be considered a contributing cause of plaintiff's injury. Accordingly, it could not provide a basis for a judgment in plaintiff's favor. (*Rios v. Sifuentes* (1976), 38 Ill. App. 3d 128, 347 N.E.2d 337.) Also, because plaintiff had only a license to use the crossing, he would have had to prove wilful and wanton conduct on the part of defendant in order to recover on this basis (*Cunningham*), a standard not violated by running a train in daylight without a headlight. See *Spring v. Toledo, Peoria & Western R.R. Co.* (1977), 69 Ill. 2d 290, 371 N.E.2d 621, for the supreme court's recent discussion of the wilful and wanton conduct standard.

Plaintiff also assigns error in the trial court's refusal to admit in evidence Illinois Commerce Commission General Order No. 138. Though plaintiff asserts the evidence was refused on grounds of relevance, the reason for the trial court's ruling does not appear of record. Defendant objected "on the grounds set forth and ruled upon by the Court in chambers." This follows shortly after a court reporter's note that the pertinent conference in chambers "was requested not to be transcribed by Plaintiff's Attorney." Obviously, we cannot consider facts not in the record. (*Bettenhausen v. Guenther* (1944), 388 Ill. 487, 58 N.E.2d 550.) However, we believe General Order No. 138 was irrelevant to the issue raised by the plaintiff's evidence because it is limited in its application to crossings of public roadways. The ruling was not error.

For the reasons above stated, the judgment of the circuit court of Williamson County is affirmed.

Affirmed.

KASSERMAN, J., concurs.

Mr. JUSTICE HARRISON, specially concurring:
I agree with the judgment of the court. However, this case presents an excellent example of why we should abolish the distinction between trespasser, licensee, and invitee.