(No. 75948.—Affirmed.)

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. DEMETRIUS HENDERSON, Appellant.

*Opinion filed January 25, 1996.—Rehearing denied April 1, 1996.*

HARRISON, J., took no part.

Alan M. Freedman, Bruce H. Bornstein and Carol R. Heise, of Freedman & Bornstein, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Judy L. DeAngelis, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McMORROW delivered the opinion of the court:

The defendant, Demetrius Henderson, appeals from an order of the circuit court of Cook County dismissing, without an evidentiary hearing, his petition for relief under the Post-Conviction Hearing Act (Ill. Rev. Stat. 1989, ch. 38, par. 122—1 *et seq.*). Because he was sentenced to death, defendant's appeal lies directly to this court. (134 Ill. 2d R. 651.) For the reasons which follow, we affirm the judgment of the circuit court.

## BACKGROUND

The defendant's convictions stem from incidents which took place on the night of July 12, 1986, and which extended into the early morning hours of July 13,

1986. During the course of a party held that night and morning, defendant and several codefendants sexually assaulted Kimberly Boyd. After the assault, the defendant told his codefendants that they would have to kill the victim because he was "not going to spend no time in jail" for having raped her. The victim was subsequently blindfolded and placed in the trunk of defendant's car. Defendant, and one codefendant, then proceeded to an alley in Chicago where they removed the victim from the trunk, stabbed her over 40 times, and ran over her with the car until they were certain she was dead. A police investigation initiated after the discovery of the body led to the eventual arrest of defendant and a lengthy statement in which defendant admitted to the crimes. Following a jury trial in the circuit court of Cook County defendant was found guilty of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(a)), aggravated criminal sexual assault (Ill. Rev. Stat. 1985, ch. 38, par. 12—14(a)), and aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2(a)).

At the sentencing hearing, the trial judge determined that defendant was 18 years old at the time of the murder, that he had killed the victim during the course of a felony, and, therefore, that he was eligible for the death penalty. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6).) After hearing evidence in aggravation and mitigation, the judge also determined that there were no mitigating factors sufficient to preclude the imposition of the death penalty, and sentenced defendant to death.

Defendant's murder conviction and death sentence were affirmed by this court on direct appeal. (*People v. Henderson* (1990), 142 Ill. 2d 258.) The United States Supreme Court subsequently denied defendant's petition for writ of *certiorari*. (*Henderson v. Illinois* (1991), 502 U.S. 882, 116 L. Ed. 2d 189, 112 S. Ct. 233.) On April

7, 1992, defendant filed a petition with the circuit court of Cook County for relief pursuant to the Post-Conviction Hearing Act (Ill. Rev. Stat. 1987, ch. 38, par. 122—1 *et seq.*). The State filed a motion to dismiss. The circuit court considered the allegations raised in the post-conviction petition, and after hearing arguments, concluded that the defendant had failed to establish that he was entitled to an evidentiary hearing or post-conviction relief. Accordingly, the court ordered the dismissal of the post-conviction petition. Defendant now appeals that order, alternatively seeking remand for a new trial, remand for a new sentencing hearing, or remand for an evidentiary hearing.

## ANALYSIS

The general rules regarding post-conviction proceedings are familiar. The Post-Conviction Hearing Act provides a remedy for defendants who have suffered a substantial violation of their constitutional rights at trial. (*People v. Brisbon* (1995), 164 Ill. 2d 236, 242.) A post-conviction proceeding is not an appeal of the underlying conviction; rather, it is a collateral attack on the trial court proceedings in which a defendant attempts to establish constitutional violations that have not been and could not have been previously adjudicated. (*People v. Thompkins* (1994), 161 Ill. 2d 148, 157.) The defendant bears the burden of establishing that a substantial violation of his constitutional rights occurred. (*People v. Eddmonds* (1991), 143 Ill. 2d 501, 510.) In addition, this court will not disturb the trial court's ruling on a defendant's petition for post-conviction relief absent a showing of manifest error. *People v. Hall* (1993), 157 Ill. 2d 324, 331.

Defendant makes two principal arguments before this court. First, defendant argues that the standard by which the trial judge determined that he should be sentenced to death was unconstitutionally vague and

arbitrary, and was imposed upon him without proper notice. Second, defendant argues that the circuit court erroneously dismissed his post-conviction claims of ineffective assistance of counsel without allowing discovery or conducting an evidentiary hearing.

## I

With respect to defendant's argument regarding the trial judge's basis for imposing the death penalty, defendant contends that the trial judge refused to consider evidence which he presented during the aggravation and mitigation phase of the sentencing hearing. Instead, defendant contends that the judge focused exclusively on defendant's alleged inability to be rehabilitated and, further, that this was the judge's sole basis for imposing the death penalty. Defendant bases these contentions primarily on two comments made by the trial judge near the end of sentencing. In response to evidence that defendant's violent and dysfunctional upbringing made criminal action on his part essentially inevitable, the judge noted that "[a] mitigating factor is not that it is inevitable that the defendant act out his aggressions against people and society, the mitigating factor is that there is some way to rehabilitate and change that and make sure that it will never happen again." Later, the judge also stated: "I don't think that Mr. Henderson is a person that I believe can be rehabilitated."

Defendant asserts that the trial judge's "rehabilitative potential" standard is vague and arbitrary, both facially and as applied, and that it was imposed upon him in violation of his constitutional rights under the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV). He asserts further that this standard was imposed without proper notice, and that if he had known the trial judge's sole focus was to be on his potential for rehabilitation, he could have prepared substantial evidence in mitigation. In response, the

State maintains that defendant's argument is barred by principles of waiver and *res judicata*.

Initially, we note that defendant's "rehabilitative potential" argument was not squarely addressed in the direct appeal. In that appeal, defendant argued that the trial judge improperly considered the testimony given by a social worker during sentencing in aggravation, when the judge should have considered it in mitigation. The trial judge stated that the social worker's testimony, describing the defendant's violent and dysfunctional family history, caused him to believe that defendant could not be rehabilitated and would remain a danger to society. This court held that it was within the trial judge's discretion to consider the social worker's testimony in aggravation, and that the judge was not required to consider the family history of the defendant solely as mitigation evidence. (*People v. Henderson* (1990), 142 Ill. 2d 258, 340-41.) This court made additional comments concerning the trial judge's basis for imposing the death penalty, but the holding of the court on this issue was limited to the determination that the "trial judge did not err in his evaluation of [the social worker's] evidence." *Henderson*, 142 Ill. 2d at 341.

However, while we agree that defendant's "rehabilitative potential" argument has not been previously considered by this court, we must conclude that the argument has been technically waived. Under the general rule, in a post-conviction proceeding, an issue is deemed waived when it could have been presented on direct appeal but was not. (*People v. Albanese* (1988), 125 Ill. 2d 100, 104-05.) In the case at bar, defendant's "rehabilitative potential" argument is focused almost entirely on the statements and actions of the trial judge during the sentencing hearing, matters which were part of the trial record. Hence, defendant could have raised the "rehabilitative potential" argument on direct appeal, but chose not to.

In response, defendant points out that among the many exhibits attached to the post-conviction petition are copies of decisions from other capital cases presided over by the same judge who had sentenced defendant to death. In some of those cases, the judge had considered the respective defendant's potential for rehabilitation, while in others he had not. Defendant argues that these cases are evidence of the vague and arbitrary nature of the judge's "rehabilitative potential" standard and that, because these cases were not part of the record on direct appeal, his argument is not waived. (See *People v. Porter* (1995), 164 Ill. 2d 400, 404-05.) We disagree. It is well established that courts may take judicial notice of matters which are commonly known or, if not commonly known, are readily verifiable from sources of indisputable accuracy. (*Murdy v. Edgar* (1984), 103 Ill. 2d 384, 394.) The cases defendant offered with his post-conviction petition are public documents which fall within the category of readily verifiable matters. (See, *e.g.*, *May Department Stores Co. v. Teamsters Union Local No. 743* (1976), 64 Ill. 2d 153, 159; *Nordine v. Illinois Power Co.* (1965), 32 Ill. 2d 421, 428; *NBD Highland Park Bank, N.A. v. Wien* (1993), 251 Ill. App. 3d 512, 520-21; *Pearce v. Illinois Central Gulf R.R. Co.* (1980), 89 Ill. App. 3d 22, 30.) If essential to his argument, defendant faced no bar in presenting these additional cases on direct appeal.

Furthermore, even assuming, *arguendo*, that defendant's "rehabilitative potential" argument has not been waived, it is nevertheless unsupported by the facts or by law. The underlying premise of defendant's argument—that his inability to be rehabilitated was the sole criterion used by the trial judge in imposing the death penalty—is unsupported by the facts before this court. A review of the record indicates that the trial judge plainly considered other factors in addition to the

defendant's potential for rehabilitation when the court determined that defendant deserved the death penalty. Indeed, after hearing the evidence offered at sentencing, the trial judge explicitly recited and applied the statutory list of mitigating factors. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c).

The judge took note of whether a lack of a prior history of criminal activity could mitigate against imposing the death penalty. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(1).) The judge noted that defendant had struck a woman who attempted to retrieve a videotape from his apartment and, in a separate incident, had shot at her in a car. The judge also noted that defendant had struck his girlfriend and mother of his child in the head with a wrench, injuring her to the extent that she required hospitalization. Based on this evidence, the judge concluded that there was, in fact, "a significant history of prior criminal activity on behalf of Mr. Henderson."

The trial judge also determined that defendant was not under the influence of extreme mental or emotional disturbance (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(2)) and, further, that the victim was not a participant in the defendant's homicidal conduct and did not consent to the homicidal act (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(3)). In considering whether defendant acted under the compulsion of a threat of imminent infliction of death or great bodily harm when he committed his crimes (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(4)), the judge noted,

"There is no such evidence here, in fact, not only was Mr. Henderson not compelled to do as he did, but he took the time to contemplate and reflect about what his acts would be while the girl was in the trunk of the car and while he rode around to decide what type of violence he would perpetrate upon her.

As difficult as it was for me to understand at the time that I heard the evidence, but I heard it again and

reviewed the transcript, with Kim Boyd locked and blindfolded and bound in the trunk of the car, he stops his automobile in a neighborhood he was familiar with to give a jump to another friend's car that couldn't be started, he was so overwrought, apparently, as he would like to say, with this quick action and this passionate reaction of violence that he took the time to use his mechanical skills to aid a friend.

I find that is not mitigating in the least, I find it aggravating, and I find that it shows me that Mr. Henderson is a cold and calculating and uncaring individual who has taken this life with planning."

Finally, the trial judge noted that defendant was personally present during the commission of the murder. Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(3).

Summarizing, the record is clear that more was considered at sentencing than defendant's ability to be rehabilitated. The judge considered both the aggravating and mitigating evidence presented and made an "individualized determination on the basis of the character of the individual and the circumstances of the crime" (emphasis omitted) (*Zant v. Stephens* (1983), 462 U.S. 862, 879, 77 L. Ed. 2d 235, 251, 103 S. Ct. 2733, 2743-44) that defendant deserved the death penalty.

The lack of factual support for defendant's "rehabilitative potential" argument is paralleled by a lack of sound legal support. Defendant argues that "[t]he rehabilitative standard is vague on its face" because it is unclear under such a standard whether the sentencer is required to consider the potential that the defendant can be rehabilitated to useful citizenship in society, a "higher" standard, or whether the sentencer can consider that the defendant can be sufficiently rehabilitated to exist in a prison setting, a "lower" standard. We find no support for this proposition.

First, we note that there is no basis for concluding, as a matter of law, that there are "higher" and "lower" standards of rehabilitation. As the State correctly points

out, incarceration need not presuppose continued criminality. To adopt defendant's argument on this issue would necessitate excluding the possibility that one may follow the precepts of accepted behavior while remaining in prison. See *People v. Coleman* (1994), 158 Ill. 2d 319, 358 (evidence that defendant could not be restored to useful citizenship admissible, even though defendant faced, at minimum, a natural life sentence).

In addition, there is nothing inherently vague about considering, as a factor in sentencing, a defendant's potential for rehabilitation. (*Jurek v. Texas* (1976), 428 U.S. 262, 274-76, 49 L. Ed. 2d 929, 940-41, 96 S. Ct. 2950, 2957-58 (opinion of Stevens, J., joined by Stewart and Powell, JJ.).) Even though future behavior may not be easy to predict, "[t]he fact that such a determination is difficult, however, does not mean that it cannot be made." (*Jurek*, 428 U.S. at 274-75, 49 L. Ed. 2d at 940, 96 S. Ct. at 2957.) Indeed, "[b]oth a backward-looking and a forward-looking inquiry are a permissible part of the sentencing process ***." *Tuilaepa v. California* (1994), 512 U.S. 967, 977, 129 L. Ed. 2d 750, 762, 114 S. Ct. 2630, 2637.

Defendant argues further that the trial judge's "rehabilitative potential" standard is unconstitutional because of its arbitrary application. In support, defendant points to decisions from other capital cases presided over by the same judge who sentenced defendant in the case at bar to death. In some of those cases, the judge had considered the respective defendant's potential for rehabilitation, while in others he had not.

As a general matter, it is well established that a trial court has discretion to consider virtually all relevant evidence during sentencing. As this court has noted, "[i]n determining the appropriate sentence, the trial judge is to consider all matters reflecting upon the defendant's personality, propensities, purposes, tenden-

cies, and indeed every aspect of his life relevant to the sentencing proceeding. [Citations.] *** As a general proposition, any evidence regarding the defendant's character is relevant and admissible. [Citations.]" (*People v. Barrow* (1989), 133 Ill. 2d 226, 281-82.) In capital cases, the trial court is constitutionally required under the eighth amendment to consider the character and record of the defendant and the circumstances of the offense so that the defendant receives a truly individualized sentencing. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 303-04, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991.) Moreover, because of the constitutional requirement of individualized sentencing, the sentencer may be given " 'unbridled discretion in determining whether the death penalty should be imposed after it has found that the defendant is a member of the class made eligible for that penalty.' " *Tuilaepa*, 512 U.S. at 979-80, 129 L. Ed. 2d at 764, 114 S. Ct. at 2639, quoting *Zant v. Stephens* (1983), 462 U.S. 862, 875, 77 L. Ed. 2d 235, 248, 103 S. Ct. 2733, 2742.

In the case at bar, defendant's inability to be rehabilitated was viewed as an aggravating factor in the second phase of the sentencing hearing. Given the discretion that is afforded the trial judge at that stage, we cannot conclude that the judge in the instant case acted arbitrarily by considering defendant's potential for rehabilitation, regardless of whether he considered that potential in other capital cases. (See *Tuilaepa*, 512 U.S. at 994 n.21, 129 L. Ed. 2d at 773 n.21, 114 S. Ct. at 2646 n.21 (Blackmun, J., dissenting) (arbitrariness challenge to sentencing factor "would require something more than merely pointing to others who committed similar offenses and did not receive the death penalty").) Furthermore, as this court has noted previously, "it has not been our practice to review and compare sentences when they arise from different operative facts." (*People*

*v. Johnson* (1992), 149 Ill. 2d 118, 158.) We therefore decline to review and compare the cases which defendant submitted with his post-conviction petition.

Finally, we note that defendant is in error in his reliance on *Lankford v. Idaho* (1991), 500 U.S. 110, 114 L. Ed. 2d 173, 111 S. Ct. 1723, to support the proposition that he was entitled to notice of the trial judge's "rehabilitative potential" standard. In *Lankford,* the State of Idaho, through a presentencing order, advised the trial court that it was not seeking the death penalty. During the sentencing hearing, the defendant did not present any mitigating evidence but, instead, simply argued the merits of different prison terms. Nevertheless, the trial court, *sua sponte,* determined that the defendant should be sentenced to death. On review, the United States Supreme Court concluded that the defendant was denied due process because he did not have "adequate notice of the critical issue that the judge was actually debating." (*Lankford,* 500 U.S. at 120, 114 L. Ed. 2d at 184, 111 S. Ct. at 1729.) Unlike the situation in *Lankford,* the defendant in the case at bar had notice that the State was seeking the death penalty. Thus, defendant was aware that his character, which included his rehabilitative potential, could be relied upon by the trial judge in determining his sentence.

In regard to the first contention in this appeal, that the trial court used a vague and arbitrary standard to determine whether the death penalty should be imposed, defendant has failed to establish that a substantial constitutional violation occurred. Therefore, we hold that the circuit court properly dismissed defendant's post-conviction claim that the trial judge used an unconstitutional "rehabilitative potential" standard in sentencing defendant to death.

## II

We next consider defendant's contention that the

circuit court erroneously dismissed his post-conviction claims of ineffective assistance of counsel without allowing discovery or an evidentiary hearing. Defendant's arguments regarding ineffective assistance of counsel are centered on the conduct of trial counsel at the hearing held on defendant's motion to suppress his confession and the conduct of trial counsel at the sentencing hearing. In addition, defendant asserts that he should have been given the opportunity to depose trial counsel and to appoint an otologist (an ear specialist) to examine defendant.

At the outset we note that a defendant is not entitled to an evidentiary hearing on his post-conviction petition as a matter of right. (*People v. Albanèse* (1988), 125 Ill. 2d 100, 115.) Instead, the factual allegations contained in the petition, supported where necessary by the trial record and affidavits, must first show that a substantial constitutional violation occurred before a defendant will receive such a hearing. *People v. Caballero* (1989), 126 Ill. 2d 248, 259.

### A. Suppression Hearing

Defendant contends that he received ineffective assistance of counsel during his suppression hearing because trial counsel failed to present medical records which support his claim that he was physically coerced into giving his statement. During the suppression hearing, defendant argued, *inter alia*, that he was tired and physically ill during his interrogation; that he was isolated for several hours and was not permitted to make a phone call to contact his family; and that he was impermissibly confronted with a codefendant who made an incriminating statement in his presence. Most importantly, defendant argued that the police officers who interrogated him slapped and punched him and struck him with a telephone book until he gave his confession.

In response to these arguments, the State presented considerable evidence to establish that defendant's statement was given voluntarily. The State's witnesses, including the police officers and the assistant State's Attorney who took defendant's statement, testified that none of them had struck or punched defendant. The assistant State's Attorney also testified that defendant never complained to him about being struck by the police officers. Defendant's signed statement indicated that he had been treated fairly and that no threats or promises had been made in exchange for the statement. A photograph of defendant which was taken after he gave his statement, and which was shown to him at the suppression hearing, showed no obvious signs of injury. Significantly, on cross-examination during the hearing, defendant testified that during a prison intake examination which took place out of the presence of the police officers and the assistant State's Attorney on the day after his arrest, he did not complain of any injuries and, in fact, stated that he was in good health. Defendant also testified on cross-examination that his ear "was not bothering" him at the time of the intake examination.

At the suppression hearing, the trial judge found defendant's version of the events surrounding the confession not "worthy of belief." In particular, the judge found it difficult to believe that defendant never mentioned the alleged beatings to the assistant State's Attorney, even though, according to defendant, the assistant State's Attorney entered the interrogation room immediately after the alleged beatings took place in order to record defendant's statement. With respect to defendant's claim that he was denied a phone call, the judge noted that the purpose of the phone call is to provide notice of being in custody to one's family. Since defendant's mother had been present at his arrest and had, in fact, seen him at the police station, notice had

been achieved. The judge also found that the police had not confronted defendant with the codefendant on their own initiative but, rather, that defendant himself had requested the confrontation. Based on these findings, the trial court denied defendant's motion to suppress.

Subsequently, in his post-conviction petition, defendant alleged that newly discovered medical records indicated that he had suffered an ear injury and permanent hearing loss at the hands of the police. These medical records consisted of "progress notes" taken during several medical examinations of defendant while he was in prison beginning sometime in 1986 and ending in April 1988. Defendant asserts that trial counsel's failure to present this evidence constitutes a *prima facie* case of ineffectiveness and, therefore, that the circuit court erred in denying his post-conviction petition. We disagree.

In order to sustain a claim of ineffective assistance of counsel, defendant must show that trial counsel's performance fell below that of a reasonable attorney, and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 694, 80 L. Ed. 2d 674, 693, 698, 104 S. Ct. 2052, 2064, 2068 (adopted by this court in *People v. Albanese* (1984), 104 Ill. 2d 504, 525-26).) This, defendant has failed to do.

The first medical record in the post-conviction petition, which is dated only "1986," indicates that defendant claimed he was hit in the left ear by the Chicago police during his interrogation on July 17-18, 1986. There is a notation on the record reading: "TM intact—small ant area—possible healed perforation but non specific" and a note that defendant was to see an ear, nose and throat doctor on "Friday." The second record, dated December 30, 1986, notes that defendant com-

plained of earaches, that he had wax in his left ear, and that he was given medication. The next two records indicate defendant had ear wax and that he complained of having bronchitis. In a fifth record dated March 24, 1987, defendant complained of having an earache, dizziness and headaches. A notation in that record reads "One enmate [*sic*] hit him on the L side of the head." In a sixth record dated April 7, 1987, defendant complained of having "testicle edema." In addition, there was a notation reading "Head Trauma 2d fight." The seventh record, dated April 24, 1987, contains a notation reading: "I not [*sic*] convinced that any of probable [hearing loss] from alleged beating so I feel we need complete audiogram since defendant feels this will be used in trial." The eighth, and final, record is dated April 11, 1988. It notes that defendant has a hearing loss and that he had been fitted with a hearing aid.

The suppression hearing was held in April 1987. Thus, the record which definitively establishes defendant's hearing loss (the final record dated April 11, 1988) was not available until one year after the hearing. Defendant's trial counsel therefore cannot be faulted for failing to present a medical record which did not exist at the time of the hearing.

Moreover, the remaining medical records are ambiguous in their support for defendant's position. While the first record notes defendant's complaint that the police struck him, the record is dated only "1986." Because the record notes that a follow-up appointment was scheduled, and because the next record is dated December 30, 1986, it is possible to interpret these records as supporting the argument that defendant's first complaint of police mistreatment was not made until several months after the interrogation took place in July 1986, an interpretation which weighs against defendant's allegations of police misconduct. (See, *e.g.*, *People*

*v. Case* (1991), 218 Ill. App. 3d 146, 156 (failure to complain of injuries at prison intake examination evidence that defendant was not injured while in police custody).) In addition, because of the reference to a "2d fight" in the record dated April 7, 1987, it is possible to interpret the medical records as supporting the argument that defendant suffered injuries while in prison, and that those injuries were the source of his hearing loss.

In sum, the medical records are not particularly helpful to defendant; it is impossible to tell from them when defendant's hearing loss occurred or how it occurred, and inferences may be drawn from them which are detrimental to defendant's position. Given these facts, we cannot say that the failure to present the medical records substantially shows that defendant's trial counsel was not rendering "reasonably effective assistance" within the range of "competence demanded of attorneys in criminal cases." *Strickland*, 466 U.S. at 687-88, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.

Further, in view of the evidence offered by the State to support its claim of voluntariness, including the detailed confession, the police and assistant State's Attorney's testimony, and, in particular, the lack of any complaints of injury by defendant, we cannot say that these records establish a reasonable probability that the outcome of the suppression hearing would have been different had they been available. Therefore, we conclude that the circuit court was correct to deny an evidentiary hearing on this matter.

### B. Sentencing Hearing

Defendant contends that trial counsel was ineffective during the sentencing hearing in two ways. First, defendant contends that trial counsel failed to "develop and articulate a cohesive theory of mitigation" prior to sentencing. Second, defendant contends that trial

counsel's presentation of mitigation evidence was inadequate. To sustain his claim of ineffective assistance of counsel at this stage, defendant must establish that counsel's actions were objectively deficient and that, absent counsel's errors, there is a reasonable probability that the judge "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.

### 1. *Failure to Have Coherent Mitigation Plan*

Defendant asserts that in the case at bar, "[t]here was no real chance to avoid a guilty verdict" and that, therefore, trial counsel's failure to develop a "coherent" mitigation plan prior to sentencing meant his performance fell below "the normal standard of care." In support of this assertion, defendant principally relies on two affidavits and a letter which were included with his post-conviction petition. In the first affidavit, Mildred Lincoln, a friend of the family who testified at the sentencing hearing, stated that she did not have contact with trial counsel until after the verdict had been reached. In the second affidavit, Rev. Gordon McLean, a prison chaplain who also testified on defendant's behalf, indicated that he was first approached by trial counsel in the middle of the sentencing hearing. In the letter, which was sent after the verdict had been reached, trial counsel asked defendant's mother if she knew of anyone who could testify on defendant's behalf at his sentencing hearing.

Defendant further maintains that in addition to being inadequately prepared, trial counsel used a strategy during the guilt-innocence phase of trial which prejudiced his sentencing hearing. Specifically, defendant maintains that, without his knowledge, trial counsel requested that his mother and grandmother commit perjury by testifying as to his whereabouts on the night

of the murder. Defendant maintains that because of the resulting loss of credibility, trial counsel was precluded from calling his mother and grandmother as important mitigating witnesses at the sentencing hearing.

To analyze defendant's claims, we summarize the evidence which he presented at the sentencing hearing. Three witnesses testified in mitigation. First to testify was Sheri Dinguss, a caseworker for the Cook County social services department. Dinguss had prepared a psycho-social evaluation of defendant based on interviews with defendant and his family. Dinguss was of the opinion that defendant's upbringing was "severely dysfunctional." The nature and extent of this dysfunction was summarized in this court's opinion on direct appeal:

> "Defendant, an only child, was raised by his mother, his father having been shot and killed by his mother's uncle before defendant reached his first birthday; this same uncle was shot and killed by his own wife; defendant's grandfather committed suicide; defendant's mother was sexually promiscuous throughout his childhood, a situation he resented, and defendant had been abused by men; his mother had also been molested to some degree by her father and uncle; defendant said his female cousins had molested him; as for defendant's past behavior, he had been involved in gangs, had hit women with his hands and hit the mother of one of his many children with a wrench, and had shot at a woman on a public street."
> *Henderson*, 142 Ill. 2d at 335-36.

Although there was no evidence that defendant had ever been physically abused, Dinguss believed that he had been emotionally abused by his mother and had suffered some "psychological trauma" from his upbringing. Dinguss also believed that defendant's violent behavior would continue unless he received "long-term intensive psychotherapeutic intervention."

Trial counsel also called Mildred Lincoln, a licensed social worker and program director for the homeless at

Catholic Charities. Lincoln was a close friend of defendant's family. Lincoln testified that defendant was a very insecure person who needed to be accepted by others and who often did things to get others to like him. She testified that she was confused when she heard that defendant had committed murder because, in her experience, defendant had always shied away from violence. She did not believe that defendant was the kind of person who could have planned the murder and she knew that he was not cruel. In addition, she noted that any lack of remorse by defendant was due to his need to "act like the big man" because of his feelings of insecurity.

The final witness to present mitigating testimony was Rev. Gordon McLean, a chaplain at Cook County jail. Rev. McLean testified that he had spoken with defendant approximately 20 to 25 times, both before, during and after his trial. During one of their conversations, Rev. McLean asked defendant whether he could sympathize with the feelings of the victim's family. According to Rev. McLean, defendant began to cry and said "that was a terrible thing, I wish I had never had any part of it, but I did, I would give anything that I could possibly imagine or have or do if that young girl could be alive and back with her family, but that can never happen and I'm responsible for that." Rev. McLean testified further that he was surprised at defendant's response and felt he was "being genuine."

In light of the foregoing testimony, we fail to see how the letter and affidavits which defendant has presented establish that trial counsel did not have a "coherent" strategy prior to the sentencing hearing. Trial counsel attempted to show that defendant was a deeply troubled individual whose dysfunctional upbringing made his actions, if not excusable, at least understandable. If trial counsel was unsuccessful in his arguments

for leniency, that does not mean that his efforts lacked coherence. See *People v. Franklin* (1990), 135 Ill. 2d 78, 118-19.

Defendant would liken the case at bar to *Brewer v. Aiken* (7th Cir. 1991), 935 F.2d 850. In *Brewer*, the defendant's attorney was unaware that, under a new Indiana death penalty statute, the sentencing hearing would immediately follow the guilt phase of the trial. The attorney requested a continuance but was refused, thereby denying the attorney time to investigate information he had just received regarding the defendant's mental history. At the sentencing hearing, the defendant was subjected to "devastating" cross-examination which showed that he had committed perjury. The defendant's attorney never questioned him about his mental history and, indeed, elected not to present any mitigating evidence. (*Brewer*, 935 F.2d at 851-52.) The reviewing court determined that the defendant had received ineffective assistance of counsel because there was a reasonable probability that, absent his attorney's errors, the outcome of the proceeding might have been different. *Brewer*, 935 F.2d at 860.

Defendant's reliance on *Brewer* is misplaced. In the case at bar, trial counsel used the time between the trial and the sentencing hearing to request the psychosocial evaluation prepared by Dinguss and to seek out further mitigating witnesses from defendant's mother. He presented the testimony of Dinguss, Lincoln and Rev. McLean in an attempt to explain defendant's actions, to humanize him and to show his remorse. Indeed, defendant has alleged nothing which would overcome the "strong presumption" that trial counsel's preparation for the sentencing hearing fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065.

Nor are we persuaded that trial counsel knowingly

requested defendant's mother and grandmother to commit perjury. In affidavits attached to the post-conviction petition, both women state merely that they "understood [trial counsel] to mean" that he wanted them to say defendant was home with his family. Further, while trial counsel was not precluded from calling defendant's mother and grandmother as mitigation witnesses, evidence in the record indicates that he may have had reason not to. Dinguss testified that she believed defendant's mother had "serious psychological problems" and that she had emotionally abused defendant. According to the affidavit of a family friend, defendant's grandmother "drank regularly and to the point of being drunk." According to her own affidavit, defendant's grandmother at one time suspected that defendant's mother, or some of her boyfriends, had molested defendant. Given this information, trial counsel's decision not to call defendant's mother and grandmother as mitigating witnesses fell within "the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 695, 104 S. Ct. at 2065. See also *People v. Coleman* (1995), 168 Ill. 2d 509, 535-36; *People v. Caballero* (1989), 126 Ill. 2d 248, 275 ("In all cases where the drawbacks of potentially mitigating evidence are obvious from the record, we must presume that it was these drawbacks, and not merely lack of diligence, which was behind counsel's decision").

Finally, we note, but decline to address, defendant's argument that because he was unaware of trial counsel's strategy and what mitigation evidence was to be used to defeat the death penalty, his waiver of jury sentencing could not have been intelligently made. Defendant's jury waiver was previously addressed on direct appeal and we will not consider it again here. *Henderson*, 142 Ill. 2d at 334-35.

## 2. *Inadequate Presentation of Mitigation Evidence*

Along with his post-conviction petition, defendant presented a psychological evaluation prepared by Dr. Kip Hillman, a clinical psychologist. Dr. Hillman interviewed defendant and had him undergo a number of psychological tests. Dr. Hillman determined that defendant had an IQ in the range of 75 to 85, that his "performance on abstract tasks was slightly above the level of mild mental retardation," and that he had a "severe character disorder of the borderline type." In addition, Dr. Hillman was of the opinion that defendant was suffering from an extreme mental and emotional disturbance at the time of the crimes. See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(c)(2).

Defendant contends that Dr. Hillman's findings were readily available to trial counsel. He contends further that there was no strategic reason for trial counsel not to have discovered or presented this information and that his failure to do so is evidence of his ineffectiveness. In response, the State asserts that this issue was previously considered in this court's opinion on direct appeal and therefore is *res judicata*.

On direct appeal, defendant argued that his trial counsel was ineffective for failing to request a psychiatric examination when, in her psycho-social evaluation, Dinguss had noted that a "thorough psychiatric workup" was needed to determine precisely the extent of defendant's psychological trauma. This court held that trial counsel acted effectively in relying on the psycho-social evaluation alone because defendant's mental condition was not at issue and because it was speculative to consider what additional mitigating evidence a psychiatric examination might have produced. (*Henderson,* 142 Ill. 2d at 341-45.) However, Dr. Hillman's findings were not part of the record on direct appeal. Because rules of waiver and *res judicata* are relaxed when the evidence of counsel's deficiency is not part of the trial

record (*People v. Eddmonds* (1991), 143 Ill. 2d 501, 528), we will consider the merits of defendant's claims. See *People v. Orange* (1995), 168 Ill. 2d 138, 166-67.

In the alternative to its *res judicata* argument, the State asserts that even if trial counsel's failure to present Dr. Hillman's findings was professionally unreasonable, defendant nevertheless did not suffer any prejudice from that failure. We agree. After carefully reviewing Dr. Hillman's report, we conclude that defendant has failed to demonstrate a reasonable probability that, had the report been available, the trial judge would have determined that defendant did not deserve the death penalty. First, much of Dr. Hillman's report simply restates details of defendant's troubled upbringing and family background. This information was not only cumulative to Dinguss' testimony but could have been considered aggravating as well. (*Henderson*, 142 Ill. 2d at 336-41.) Similarly, it is not clear that the trial judge would have reacted sympathetically to Dr. Hillman's conclusions that defendant had a low IQ, that he suffered from a severe character disorder and that he had adapted to his environment by "aggressive acting out through fighting and sexual activity." (See *People v. Foster* (1995), 168 Ill. 2d 465, 491; *Coleman*, 168 Ill. 2d at 537-38; *Penry v. Lynaugh* (1989), 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (characterizing evidence of mental retardation and abuse as having potential to be both mitigating and aggravating).) That these conclusions would have been given little consideration as mitigating evidence is especially likely given the context in which they would have been offered. As the trial judge noted, having a psychologist "throw his opinion into the record" would not have assisted him in his sentencing decision because he had not

> "heard from any person who [knew defendant] intimately, nor from any person who was engaged with part of his life, including the young lady who was never married to

him or was a girlfriend by whom he had a child who testified here that no one ever said he exhibited any psychiatric instability or that he in any way exhibited any type of conduct or behavior which led them to believe that he was in need of treatment."

Nor is it reasonably likely, based on Dr. Hillman's findings, that the trial judge would have concluded that defendant was under the influence of an extreme emotional disturbance at the time of the murder, and that his mind was at " 'such a fragile point as to leave him with little to no emotional control.' " (*Foster*, 168 Ill. 2d at 491, quoting *People v. Phillips* (1989), 127 Ill. 2d 499, 534.) Prior to the murder, defendant helped orchestrate a group sexual assault of the victim which took place over an extended period of time. After the assault, according to the statement which he made to the police, defendant was responsible for persuading his codefendants that they should kill the victim. Defendant helped place the victim in the trunk of his car. With the victim in his trunk he stopped and gave a jump start to a friend's car. He then intentionally evaded several of his codefendants who were following him in a second car so they would not be present for the murder. When defendant opened the trunk of his car, again according to his statement, the victim stated that she could "explain." In response, defendant helped stab the victim over 40 times. When the stabbings failed to kill the victim, the defendant stated that he would run her over and that he would, in his words, "take responsibility for the car." He then drove over the victim three times until she was dead. Based on these facts the trial judge determined that defendant was a "cold," "calculating" and "uncaring individual" who had taken the victim's life "with planning." We consider it highly unlikely that Dr. Hillman's report would have changed this determination. See *Coleman*, 168 Ill. 2d at 538-39 (and cases cited therein); *Foster*, 168 Ill. 2d 491-92.

Defendant also contends that trial counsel was ineffective for failing to present high school records which purportedly establish that defendant was learning disabled. These school records, which were part of the postconviction petition, consist of various conference reports, teacher evaluations, progress reports, grades and other information.

The records plainly show that defendant was placed in special education classes. Several of the forms indicate that defendant was to be placed in the "LD [learning disabled] EH [educationally handicapped] program," or that he was to take "EH-LD classes [and] mainstream when appropriate." In addition, the school records show that the majority of defendant's grades were quite poor.

But perhaps the clearest indication of the school's psychological evaluation of defendant can be found on a multipurpose conference report form which appears several times among the school records. A section of this form is titled "Exceptional Characteristics." In this section is a listing of various descriptive phrases, or characteristics, including "educationally handicapped" and "learning disabled." Next to each of the listed characteristics are two empty boxes, respectively under column headings labeled "primary" and "secondary." According to instructions included among the records, the "Exceptional Characteristics" list is included on the form to satisfy the requirements of "P.L. 94—142," an apparent reference to the Education for All Handicapped Children Act of 1975 (20 U.S.C. §§ 1232, 1401, 1405, 1406, 1411 *et seq.*, 1453 (1988)). The instructions note that "[t]he information under 'Exceptional Characteristics: Primary' must correspond with where the student appeared/will appear on the 94—142 Child Count."

All of defendant's completed conference report forms

have the characteristic "educationally handicapped" checked in the "primary" box. Only one of the forms has the characteristic "learning disabled" checked, and that is checked in the "secondary" box. The terms "educationally handicapped" and "learning disabled" are not defined on the forms, nor is the distinction between a "primary" and "secondary" characteristic explained. Thus, we would be left to speculate as to the extent, if any, of defendant's learning disability. More fundamentally, we would also be left to speculate as to the relationship between a learning disability and general mental impairment. Because of the absence of any conclusive psychological information on the forms, we fail to see how trial counsel's decision not to investigate or present these records substantially shows his ineffectiveness. Moreover, even if one accepts that defendant is learning disabled, defendant has failed to demonstrate how that fact creates a reasonable probability that the judge "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695, 80 L. Ed. 2d at 698, 104 S. Ct. at 2069.

In addition, we note that there is information in the school records that is potentially aggravating to defendant. Defendant's teachers made written comments on many of the different reports. Some of these comments were positive, noting, for example, that defendant got along well with others. However, most of the comments were critical, including such notes as: "does not seem to be concerned about his low level of achievement"; "talks out of turn"; "truant"; and "lazy." Trial counsel cannot be faulted for failing to present evidence which contained some mitigating evidence, but which also mentioned aggravating information, including defendant's lack of interest in education. See *People v. Jones* (1991), 144 Ill. 2d 242, 273-75.

Defendant also contends that trial counsel was ineffective because he understated the available mitigating evidence. In support of this contention, defendant points to several affidavits from family members, teachers and friends which were part of his post-conviction petition. The affidavits show that these witnesses would have testified that defendant was nice, that he liked to help others, and that he had a highly troubled upbringing. Defendant contends that if trial counsel had presented these additional witnesses there is a reasonable probability that he would not have been sentenced to death. We disagree.

We have carefully read the affidavits and have concluded that the bulk of the proffered testimony was, in fact, presented at the sentencing hearing through the testimony of the mitigation witnesses. Through the testimony of Lincoln the trial judge was informed of defendant's need to be accepted and his desire to help others. Through the testimony of Dinguss, the trial judge heard extensive information regarding defendant's dysfunctional upbringing. Additional testimony offered on these points would have been cumulative. Trial counsel's performance cannot be considered deficient because of a failure to present cumulative evidence. *People v. Brisbon* (1995), 164 Ill. 2d 236, 248.

Furthermore, some of the affiants' testimony was not helpful to defendant. James Marshall, a friend of the family, stated that he gave defendant a job at a car dealership. He noted that defendant "was very reliable," that "he worked hard" and that "he got along fine with the other workers." However, other evidence in the record establishes that defendant was employed by the car dealership for only one week. Given this information, we must conclude that Marshall's testimony would have received little weight, and, indeed, might have harmed defendant's credibility. Linda McGee, another friend of

the family, stated in her affidavit that defendant would help her out by calling her boyfriend, who was married at the time to another woman. Clearly, aiding someone in this manner is not the type of evidence which trial counsel can be faulted for failing to present.

In short, defendant has failed to demonstrate that trial counsel was ineffective for failing to have additional witnesses testify on his behalf. Further, in view of the aggravating evidence put forth by the State, including the brutal nature of the crime and defendant's violent tendencies, defendant has failed to establish a reasonable probability that the trial judge would have imposed a different sentence had these witnesses testified.

### C. Denial of Discovery

Defendant argues that the circuit court erred in denying his request to depose his trial counsel. Defendant argues that he needed to depose trial counsel in order to determine if there was any justification for several of the contested decisions at issue here. We note that the Post-Conviction Hearing Act neither authorizes nor prohibits the taking of discovery depositions; instead, "it is a matter within the trial judge's inherent authority." (*People v. Hall* (1993), 157 Ill. 2d 324, 340.) In addition, we will not disturb the trial court's determination regarding the granting of a discovery deposition absent an abuse of discretion. *Hall*, 157 Ill. 2d at 340.

In the case at bar, because none of defendant's trial counsel's actions constituted ineffective assistance of counsel, inquiry into the justifications for those actions would have been pointless. We therefore hold that the circuit court did not abuse its discretion in denying defendant's request for a deposition.

Finally, defendant argues that he should have been permitted to appoint an expert otologist to examine defendant to determine when and how he received his ear

injury. This court has previously noted that " '[w]hether to allow the appointment of an expert, and to permit introduction of his testimony, are questions committed to the discretion of the trial judge. A threshold requirement for the admission of expert testimony is that the proffered testimony be of assistance to the court or jury.' " (*Hall*, 157 Ill. 2d at 339-40, quoting *People v. Mack* (1989), 128 Ill. 2d 231, 250.) Because no one could determine precisely when and by whom defendant received his alleged ear injury, defendant's request for the appointment of an otologist to examine defendant was properly denied.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County dismissing defendant's post-conviction claims is affirmed. The clerk of this court is directed to enter an order setting Wednesday, May 22, 1996, as the date on which the sentence of death, entered in the circuit court of Cook County, is to be carried out. Defendant shall be executed in the manner provided by law. (Ill. Rev. Stat. 1991, ch. 38, par. 119—5.) The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.