In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 00-3834, 00-3778

DEMETRIUS HENDERSON,

*Petitioner-Appellee,*
*Cross-Appellant,*

*v.*

JONATHAN L. WALLS, Warden,
Menard Correctional Center,

*Respondent-Appellant,*
*Cross-Appellee.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 1079—**John A. Nordberg**, *Judge.*

ARGUED JUNE 11, 2001—DECIDED JULY 9, 2002

Before COFFEY, DIANE P. WOOD, and EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* In 1987, a jury convicted Demetrius Henderson of kidnapping 16-year-old Kimberly Boyd, gang raping her, and then, to keep her from reporting the rape, killing her by stabbing her over 40 times and repeatedly running her over with a car. (A full recitation of the gruesome details, including the identities of the other three participants in the rape, can be found in *People v.*

*Henderson*, 568 N.E.2d 1234 (Ill. 1990).) After Henderson waived his right to a sentencing jury, the trial judge conducted a sentencing hearing and determined that Henderson was eligible for the death penalty because he was over 18 years old at the time of the murder and he had killed Boyd in the course of another felony. The judge then found that there were no mitigating factors and sentenced Henderson to death. He also imposed sentences of 45 years for the aggravated criminal sexual assault and 10 years for the aggravated kidnapping. Henderson's execution has been stayed pending his appeals and petitions for post-conviction relief.

On direct appeal, the Illinois Supreme Court upheld Henderson's convictions and death sentence, although it reduced the prison term for the aggravated criminal sexual assault from 45 years to 30 years. *People v. Henderson*, 568 N.E.2d 1234. It denied his petition for a rehearing, and the United States Supreme Court denied Henderson's petition for a writ of certiorari. *Henderson v. Illinois*, 502 U.S. 882 (1991).

Henderson then filed a petition with the Circuit Court of Cook County for relief pursuant to the Post-Conviction Hearing Act, 725 ILCS 5/122-1 *et seq*. The court considered the allegations raised in the petition, heard arguments, and concluded that Henderson had failed to establish that he was entitled to an evidentiary hearing. The Illinois Supreme Court agreed that the post-conviction petition had no merit. *People v. Henderson*, 662 N.E.2d 1287 (Ill. 1996). Once again, that court denied Henderson's petition for rehearing and the United States Supreme Court denied certiorari. *Henderson v. Illinois*, 519 U.S. 953 (1996).

The case now before us began on February 8, 1997, when Henderson filed a seven-count petition in the district court seeking a writ of habeas corpus under 28 U.S.C. § 2254. His petition alleged, among other things, that (1) his trial coun-

sel was ineffective in failing to present medical evidence in support of his claim that he was physically coerced into confessing to the crimes; (2) he did not knowingly and intelligently waive his right to a sentencing jury; and (3) the prosecution discriminated against African-Americans in using its peremptory challenges. The district court rejected Henderson's first two claims but granted relief based on its finding that the Illinois Supreme Court had unreasonably applied *Batson v. Kentucky*, 476 U.S. 79 (1986), when it categorically refused to consider the similarities between excluded African-American venire members and accepted non-African-American jurors in its evaluation of Henderson's *Batson* argument. *U.S. ex rel. Henderson v. Page*, No. 97 C 1079, 2000 WL 1466204 (N.D. Ill. Sept. 29, 2000). The court ordered that the writ of habeas corpus would be granted unless the State of Illinois holds a new hearing on Henderson's *Batson* claim within 120 days of the date of the order.

The State appealed from the district court's conditional grant of the writ on the basis of the *Batson* violation. Henderson then cross-appealed after receiving a certificate of appealability from this court on the other two issues mentioned above: (1) whether he knowingly and intelligently waived his right to a sentencing jury since he was not informed that the jury must unanimously determine eligibility for the death sentence; and (2) whether trial counsel denied Henderson effective assistance of counsel at the suppression hearing in failing to present corroborating medical testimony that his confession was coerced. The later two errors, he argues, require additional relief not encompassed within the district court's order.

# I

As amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2254(d) allows a

federal court to grant a petition for a writ of habeas corpus only if the state court's adjudication of the relevant claims "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." (The post-1996 version of § 2254 applies because Henderson filed his petition after the effective date of AEDPA. See *Gosier v. Welborn*, 175 F.3d 504, 506 (7th Cir. 1999).) Even under these standards, our review of the district court's decision to grant or deny habeas petitions is *de novo*. *Hall v. Washington*, 106 F.3d 742, 748 (7th Cir. 1997). AEDPA has not altered this court's review of a district court's legal conclusions. In conducting our *de novo* review, however, the question is whether the state court "unreasonably" applied clearly established federal law as the Supreme Court has determined it. *Id.* "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams v. Taylor*, 529 U.S. 362, 413 (2000).

The question then is "whether the [state court's] determination is at least minimally consistent with the facts and circumstances of the case." *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir. 1997). In making this determination, we do not "defer" to the state court decision; AEDPA does not provide for the *Chevron* deference afforded administrative agencies. See *Lindh v. Murphy*, 96 F.3d 856, 868 (7th Cir. 1996) (en banc), rev'd on other grounds, 521 U.S. 320 (1997). We have recognized, however, that review under the amended statute is severely restricted: "the fact that we may think certain things could have been handled better by the state trial judge or by the prosecuting attorney or by a state reviewing court means very little." *Sanchez v. Gilmore*, 189 F.3d 619, 623 (7th Cir. 1999). Nonetheless, our review is not so limited as to require a finding of jud-

icial incompetence before we are allowed to overturn a state court's decision. See *Hall*, 106 F.3d at 749 ("Congress would not have used the word 'unreasonable' if it really meant that federal courts were to defer in all cases to the state court's decision.").

Applying these standards, we conclude that the district court correctly resolved all three claims we have identified here: the state courts unreasonably applied the Supreme Court's *Batson* decision, but their decisions on Henderson's other two arguments neither failed to apply the applicable law as announced by the United States Supreme Court nor did they unreasonably apply that law. We therefore affirm.

## II

### A.

We first consider the State's challenge to the district court's finding of a *Batson* violation. The record of this case comes to us in an unusual posture. The state court record at the trial level was somewhat cryptic regarding the *Batson* challenge, the *Batson* hearing (or lack thereof), and the racial make-up of the venire members both excluded and accepted. The Illinois Supreme Court noted the failure of the trial court to produce a proper record and conducted its own review of the facts regarding the number of challenges exercised by the parties and the races of the venire members challenged by the prosecution. *Henderson*, 568 N.E.2d at 1245. This, in our view, was a decision it was entitled to make. The only consequence for us is that it is the Illinois Supreme Court's own decision and its version of the facts that we now review, since that court chose to disregard the trial court's discussion and to conduct its own detailed review of the record. With that in mind, we turn to the merits of the *Batson* claim.

*Voir dire* in Henderson's case took place for two separate venires. Examination of the first venire ended after only four jurors had been sworn in. At that point, the only African-American on the venire panel told the judge that he would be unable to concentrate fully on the case, the judge excused him for cause, and he dismissed the other chosen jurors and the entire venire panel.

The trial judge then held a second *voir dire* of a 40-person panel. Three individuals were struck for cause, leaving 11 African-Americans and 26 non-African-Americans on the venire panel. The prosecution and the defense were each allotted 14 peremptory challenges; the prosecution used 10 and the defense used 13. Of the 10 peremptory challenges exercised by the prosecution, six (60%) were used against African-Americans. The prosecutor then accepted 27 members, five of whom were African-American. The defense then exercised its peremptory challenges; the net result was that three of the 14 venire members chosen to serve as jurors or alternates were African-American.

After the jurors and alternates had been sworn in, but before opening statements, defense counsel moved for a mistrial on the basis that the prosecution had intentionally excluded African-American venire members from the jury through his exercise of peremptory challenges. (Although defense counsel may have forfeited this argument by failing to object earlier, the State failed to argue forfeiture and instead attacked the motion's merits. The Illinois Supreme Court was not concerned with forfeiture, and thus neither are we.) Defense counsel pointed out that: (1) six of the ten venire members challenged by the prosecutor were African-American; (2) the jury consisted of ten non-African-Americans and two African-Americans; and (3) two of the three peremptory challenges exercised by the prosecutor during the first *voir dire* were exercised against African-Americans. The State responded by pointing to the fact that the prosecution did accept at least two and possibly three African-Americans that it could have struck.

At that point, the trial judge recognized that under *Batson* he had to "make a decision as to whether [he] should require the State to show cause as to why they made certain decisions regarding the jury," but the judge decided to wait until the next day to make a decision. The next day, a white juror was excused after she told the judge that she had some serious personal problems that would make concentration difficult. The first alternate, an African-American male, became a juror, leading to a final jury with three African-Americans. The judge then denied the *Batson* motion for a mistrial, finding that Henderson had not made out a *prima facie* case that the prosecution had excluded African-Americans from the jury in violation of *Batson*, especially in light of the fact that there were three African-Americans on the jury. The court's discussion was very limited. It reads as follows in the transcript:

> COURT:  I think the composition of the jury speaks for itself in terms of no pattern of systematic exclusion of blacks. I think further the fact that there were other blacks who were accepted by the State and that the defense opted to remove, leads me to believe that there was no systematic exclusion, therefore, I am not going to inquire further. . . . [T]he fact that there are five minority people on the jury and others that were accepted by the State is sufficient for me to indicate that there was no systematic exclusion, which is what my ruling is.
>
> * * *
>
> I also have been a trial lawyer for twenty years and have picked a lot of juries in my own time, and I don't find that people that were excluded, to my mind, were excluded toward unknown reasons, I mean, we all guess as to why all jurors are kept and why they're not, that's why we have challenges that no one has to explain under the present state of the law. . . .

Henderson was ultimately convicted by a jury consisting of nine non-African-Americans and three African-Americans.

On direct appeal to the Illinois Supreme Court, Henderson argued that the prosecution used its peremptory challenges to exclude African-Americans from the jury, in violation of the Fourteenth Amendment as interpreted by the Supreme Court in *Batson v. Kentucky*. The Illinois Supreme Court rejected this argument. *Henderson*, 568 N.E.2d 1234. It focused first on the fact that the prosecution had used only 60% of its peremptory challenges to exclude African-Americans and concluded that this was not enough to demonstrate a *prima facie* case of purposeful discrimination. *Id.* at 1249. Second, the court stated that the victim's race (African-American) negated any inference of prosecutorial discrimination, since (according to the court) prosecutors are more likely to use peremptory challenges in an improper way when they are trying to secure jurors of the same race as the victim in order to try and stir up racial hatred or fears. *Id.*

Henderson had argued that the only respect in which the struck African-Americans could be distinguished from the white jurors was by race. The court refused to consider this "comparison analysis" at the *prima facie* stage:

> [A]t this stage of a *Batson* claim we are only concerned with whether the stricken black venire members shared any characteristics other than race; it is not our role to search for possible reasons for the prosecution's strikes or for similarities between stricken black and accepted white venire members. *Id.* at 1249-50.

The court then looked at several other factors which are not relevant to this appeal. While the court was concerned with the disparity between the percentage of African-Americans on the venire (30%) and the percentage of African-

Americans on the jury (plus alternates) (21%), the court found that the rest of the relevant factors were either neutral or tended to refute an inference of discrimination. Accordingly, the court held that the trial court's finding that the defendant failed to establish a *prima facie* case of purposeful discrimination was not against the manifest weight of the evidence. *Id.* at 1250.

In his petition for habeas corpus relief, Henderson repeated the arguments he had advanced in the Illinois Supreme Court. The district court found no error in most of the Illinois Supreme Court's holdings regarding *Batson*. It found, however, that the state court had erred in its application of the *Batson* test and it conditionally granted the writ unless the State followed up with appropriate proceedings in state court.

**B.**

In *Batson v. Kentucky*, the Supreme Court held that a prosecutor is forbidden from challenging potential jurors solely on the basis of their race or on assumptions about black jurors as a group. 476 U.S. at 89. It established a three-part framework for considering challenges to a prosecutor's use of peremptory challenges. First, the defendant must establish a *prima facie* case of purposeful racial discrimination by the prosecutor in her use of peremptory challenges "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* at 93-94. If the defendant succeeds in making out a *prima facie* case, the prosecutor must offer race-neutral explanations for her exercise of peremptory challenges. *Id.* at 97. Once the prosecutor has made that proffer, the defendant may argue that the stated reasons are pretextual, and the trial court then makes a final determination. *Id.* at 98. Neither the trial court nor the Illinois

Supreme Court moved past the first stage: they both found that Henderson had not made out a *prima facie* case of discrimination, and so the prosecutor was never formally asked to explain his use of peremptory challenges. The only mention of potentially race-neutral reasons came much later in the State's brief to the Illinois Supreme Court; Henderson argued pretext in his reply brief.

*Batson* also laid out what a defendant must do to establish a *prima facie* case. First, the defendant must show that she is a member of a cognizable racial group. Second, she must show that the prosecutor exercised peremptory challenges to remove venire members of the defendant's race. Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor excluded venire members on account of their race. *Id.* at 96.

*Batson* does not provide a checklist of what trial judges should consider in evaluating these challenges. Instead, the Supreme Court said more generally that "[i]n deciding whether the defendant has made the requisite showing, the trial court should consider *all* relevant circumstances." *Id.* (emphasis added). *Batson* gave two examples of relevant circumstances: (1) "a pattern of strikes against black jurors included in the particular venire" and (2) "the prosecutor's questions and statements during *voir dire* examination." It emphasized, however, that its "examples [were] merely illustrative." *Id.* at 97. The issue now before us is whether this precedent from the Supreme Court permits a state court to exclude, at the *prima facie* stage, proffered evidence that compares excluded African-American venire members with the accepted white jurors.

The Illinois Supreme Court determined, as a matter of law, that the comparison of excluded African-American venire members with white jurors was not relevant evi-

dence: "at this stage . . . it is not our role to search . . . for similarities between stricken black and accepted white venire members." *Henderson*, 568 N.E.2d at 1250. Perhaps it was not the court's role to "search" for similarities, but in this case, Henderson had vehemently requested a comparison analysis and provided the court with all of the relevant characteristics of the excluded and accepted venire members. Declining to search out similarities is far different from refusing to consider, on relevance grounds, evidence of similarities when the defendant presents it. We see nothing in *Batson* that takes such a crabbed view of what might be relevant to the consideration of "all" the circumstances surrounding the exercise of the state's peremptory challenges. Indeed, this court has already interpreted *Batson* to require a consideration of precisely this kind of comparison evidence. See *Mahaffey v. Page*, 162 F.3d 481, 484 (7th Cir. 1998). Our decision in *Mahaffey* is obviously not directly applicable here, as we may look only to Supreme Court decisions as the source of law. But *Mahaffey* did express our understanding of the scope of *Batson,* and as such we find it a useful secondary source. Even with the benefit of further briefing in this case, we can find nothing in *Batson* that entitles a state court to exclude from the *prima facie* case an entire category of evidence that has the potential to throw light on the question of intentional discrimination.

We conclude that it was an unreasonable application of *Batson* for the Illinois Supreme Court to decline to consider this evidence as part of the *prima facie* determination. As we commented in *Mahaffey,* "[i]f an excused African-American had characteristics and opinions that were similar to those of a juror who sat, for example, then an obvious inference . . . would be that the strike was racially motivated." *Id.* at 485. Of course, had Henderson not requested the comparison analysis, and had he not offered the evidence necessary for a proper analysis, a comparison may

not have been a "relevant circumstance" for the state court to consider. But Henderson actually made all the arguments and provided all of the evidence necessary to allow the court to conduct the analysis.

First, in his appellate brief to the Illinois Supreme Court, Henderson explicitly asked the court to do a comparison analysis: "Just as the sole factor shared by 8 black jurors was their race, the sole factor which distinguished them from the ten white jurors who were seated [was] also their race. . . . The record here establishes that the State exercised 8 of 13 peremptory challenges against blacks . . . whose sole distinguishing characteristic from the ten white jurors who were selected was also their race." (Granted, Henderson did not make this argument before the trial court, but as we already discussed, we are examining the Illinois Supreme Court's decision.)

Henderson then laid out all of the information that the prosecutor had elicited about the six African-American venire members who were excluded by the State as well as the white jurors who ultimately sat on the jury. This information included the venire members' marital status, residence, employment, whether they had children, whether they had friends or family members who were lawyers or law enforcement officers, and whether they or a friend or a family member had ever been victimized by crime. In its response brief, the State offered several race-neutral explanations for its use of peremptory challenges. First, it detailed the characteristics that it found "favorable": having been a victim of a crime or having a close friend or family member who was a lawyer or law enforcement officer. Second, the State claimed that it had removed many of the African-Americans because they were single and lived alone.

Henderson's reply brief focused almost exclusively on the comparison argument and attempted to show pretext by

comparing the excluded black venire members with the accepted white jurors. He argued that of the ten white jurors originally empaneled, only four were friends or relatives of police officers or lawyers; the State accepted six white jurors without this characteristic. Of the ten white jurors, only three had been crime victims; the State accepted seven white jurors without this characteristic. The State also accepted five white jurors who possessed neither of these characteristics and exercised a peremptory challenge against an African-American venire member who possessed both of these characteristics. Finally, Henderson took issue with the argument that most of the excluded African-Americans were single and lived alone—of the six African-American jurors excluded, only three were single and lived alone. And the State accepted two white jurors who were single and lived alone.

We are troubled by the Illinois Supreme Court's dismissal of this evidence; after proper analysis, such statistics might support a finding of race discrimination in the use of peremptory challenges. Evidence of this type is indisputably part of the "relevant circumstances" that *Batson* requires a state court to consider at the *prima facie* stage. We therefore conclude that the Illinois Supreme Court's decision rejecting its relevance was an unreasonable application of *Batson*. In holding, we offer two caveats: First, we are not actually making a finding that this evidence supports a finding of discrimination—such a finding would be appropriate only after a proper statistical analysis. Nor are we conducting the comparison analysis or determining the validity of the State's justifications. This will all be the task of the state courts, should the State choose to pursue this matter in the proper tribunal. Second, we are not requiring that a comparison analysis be done at the *prima facie* stage of every *Batson* hearing. This case is about an erroneous exclusion of proffered testimony that meets the relevance standard, not about a possible failure to come

forward with evidence on either side's part. In some in-stances, or perhaps even often, a defendant will not come forward with comparison evidence until step three; in those instances, the court will evaluate the *prima facie* case based on what is before it. But when a court does have before it all of the evidence necessary for a comparison analysis, it cannot simply ignore this evidence.

We also note our concern with the Illinois Supreme Court's statement, set forth here, that the fact that the vic-tim was of the same race as the defendant tended to pre-clude a finding of purposeful discrimination:

> [W]e find that, when deducing the existence of a *prima facie* case of purposeful discrimination, whether or not the defendant and the defendant's victims are members of the same cognizable racial group is a relevant factor. In a case where the defendant is black and the victim is white, we recognize, at the prima facie stage of estab-lishing a *Batson* claim, that there is a real possibility that the prosecution, in its efforts to procure a convic-tion, will use its challenges to secure as many white jurors as possible in order to enlist any racial fears or hatred those white jurors might possess. On the other hand, in a case where both the defendants and victim are black, their racial characteristics do not warrant an inference, at the prima facie stage, that the prosecution discriminated against venire members who were black. Furthermore, we refuse to conclude that the fact that the defendant is black supports an inference of prosecu-torial discrimination regardless of the victim's race. 568 N.E.2d at 1249 (internal citations omitted).

This reasoning, in our view, is not only inconsistent with the *Batson* line of cases. It also conflicts with more general Supreme Court jurisprudence. *Batson* itself was concerned with the race of the juror and the defendant, *not* with that of the victim: "the Equal Protection Clause forbids the

prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." 476 U.S. at 89. In post-*Batson* cases, the Supreme Court has made it clear that it is worried about much more than simple bias or protectionism; *Batson* has been interpreted to require race neutrality in exercising peremptory challenges, regardless of the race of the defendant, victim, or witness. See *Powers v. Ohio*, 499 U.S. 400 (1991) (criminal defendant may object to race-based exclusions of jurors even if the defendant and the excluded juror do not share the same race); *Georgia v. McCollum*, 505 U.S. 42 (1992) (defense counsel also not allowed to exercise peremptory challenges based on race). The Court is concerned with race discrimination, the risk of depriving jurors of a significant opportunity to participate in civic life, and the risk of undermining confidence in our system of justice. In short, these cases emphasize the fact that "a person's race simply is unrelated to his fitness as a juror" regardless of the race of the defendant *or* the victim. *Powers*, 499 U.S. at 410 (internal quotations omitted).

Furthermore, the United States Supreme Court has rejected the logic behind the Illinois Supreme Court's theory. As the Court has recognized, people do not always identify with or protect people from their own racial group. In *Castaneda v. Partida*, 430 U.S. 482 (1977), the Court held that the fact that a county was 79.1% Mexican-American did not dispel a presumption that the county officials discriminated against Mexican-Americans in summoning citizens for the grand jury. In other words, sometimes persons of one race discriminate against persons of the same race—"it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group." *Id.* at 499. See also *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998) (holding same-sex sexual harassment actionable

under Title VII). These cases require us to reject stereotypical assumptions that African-Americans would want to protect members of their own race from punishment and that whites would be more willing to convict an African-American defendant, depending on the race of the victim.

In the final analysis, we conclude that the critical error lay in the state court's application of *Batson*'s "all circumstances" rule, and that this alone is enough to require us to affirm that part of the district court's judgment. We need not decide, therefore, whether the state court's assumption about the relevance of the victim's race would independently require the same result.

## III

We turn now to the two issues that Henderson has presented in his cross-appeal: ineffective assistance of counsel, and ineffective waiver of a sentencing jury. As to these, we detect no failure on the part of the Illinois Supreme Court either to identify or to apply in a reasonable fashion the applicable law as set forth by the United States Supreme Court.

## A.

When Henderson was arrested for his crimes, he gave police officers and an assistant state's attorney a fifteen-page court-reported confession. Prior to trial, defense counsel moved to suppress the confession, arguing that the interrogators coerced Henderson's statement by slapping him, punching him, and striking him on the head with a telephone book until he confessed. At the suppression hearing, the only testimony presented was that of Henderson and the police officers and the assistant state's attorney present at the interrogation. Henderson's counsel did not offer any medical testimony regarding the alleged beating

or the resulting hearing loss. In response to Henderson's allegation of abuse, the police officers and the assistant state's attorney testified that none of them had struck or punched him. The assistant state's attorney also testified that Henderson had never complained to him about being struck by the police officers. Henderson's signed statement indicated that he had been treated fairly and that no threats had been made. A photograph which was taken after he gave his statement showed no signs of injury. And on cross-examination during the hearing, Henderson testified that during a prison intake examination on the day after his arrest, he did not complain of any injuries and stated that he was in good health. The trial court denied the motion to suppress, finding Henderson's testimony incredible when compared to the police officers' denials of the beating.

In his post-conviction petition, Henderson argued that his counsel was ineffective in failing to present medical evidence corroborating his allegations of physical abuse during his interrogation, including available medical records from Cermak Health Services and the Illinois Department of Corrections which indicated that Henderson had suffered an inner ear injury. The first medical record to which he referred was the initial report of injury, dated August 19, 1986, which said that Henderson claimed he was hit in the left ear by police during his interrogation on July 17 or 18. The report noted that Henderson claimed that his ear had been bleeding, that he had trouble hearing and that there was a small perforation on the ear. A second record, dated December 30, 1986, notes that Henderson complained of earaches, had wax in his left ear, and that he was given medication. The next two records indicated that Henderson had ear wax and that he complained of having bronchitis. In another record, dated March 24, 1987 (about a month before the hearing), Henderson complained of having an earache, headaches, and dizziness. There was a notation

that read "one [i]nmate hit him on the [left] side of the head." In an April 7, 1987, record, there was a notation of "head trauma 2d fight."

The Illinois Supreme Court found that the medical records were ambiguous in their support for Henderson's motion for suppression. *People v. Henderson*, 662 N.E.2d 1287, 1298 (Ill. 1996). Critically, it was impossible to tell from the records when Henderson's hearing loss occurred or how it occurred, and an inference could be drawn that the hearing loss was caused by subsequent fights with other inmates rather than a police beating. Thus, counsel's failure to present the records was within the range of normal professional competence. Additionally, the court found that the outcome of the suppression hearing would probably not have changed had the records been entered because the State had considerable evidence to support its claim of voluntariness: the confession, the testimony of the police and the assistant state's attorney's testimony, the lack of any complaints of injury prior to the hearing, and the photos taken after the interrogation which did not show any injury. *Id.* at 1297-98. Both the lack of any conclusive support for Henderson's theory and the strength of the State's case meant that counsel's decision, whether competent or not, caused no prejudice to Henderson. The court accordingly found that, under the standards established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), Henderson had not established a claim of ineffective assistance of counsel. *Henderson*, 662 N.E.2d at 1296-98.

The district court found that the State court's dismissal of the ineffective assistance claim was not an unreasonable application of the *Strickland* rule. Under *Strickland,* a defendant alleging ineffective assistance of counsel must show that trial counsel's performance fell below "an objective standard of reasonableness," 466 U.S. at 688, and "that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. It could have been ineffective for defense counsel to fail to use available evidence to corroborate Henderson's testimony, see *Washington v. Smith*, 219 F.3d 620, 632 (7th Cir. 2000), but the medical records here did not provide such corroboration. The records established only that Henderson was complaining about earaches and hearing loss; the records could not establish with any degree of certainty the source of Henderson's ear problems. To the contrary, given the repeated references to Henderson's involvement in prison fights, the medical records create a strong inference that the injury was inflicted by a fellow inmate. Additionally, the state court reasonably concluded that Henderson could not show that there was a reasonable probability that, had the medical records been presented, the judge would have suppressed the confession.

Henderson argues, however, that a decision on the merits of the ineffective assistance claim is premature because he has not yet been allowed discovery on this issue. Right after filing his § 2254 petition, Henderson moved under 21 U.S.C. § 848(q)(4)(B) and Habeas Corpus Rule 6(a) for the court to appoint a medical expert to examine his ear. The district court denied the motion, *U.S. ex rel. Henderson v. Page*, No. 97 C 1079, 1997 WL 399623 (N.D. Ill. July 11, 1997), and also denied Henderson's motion for reconsideration. He argues now that a deposition of a medical expert was necessary in order to support his ineffective assistance claim.

A § 2254 petitioner is allowed to invoke discovery, but only "if and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise." Habeas Corpus Rule 6(a); see also *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In order to meet the Rule 6(a) requirements, Henderson must (1) make a colorable claim showing that the underlying facts, if

proven, constitute a constitutional violation; and (2) show "good cause" for the discovery. See *Harris v. Nelson*, 394 U.S. 286, 298-300 (1969). As we already discussed, Henderson has not presented a colorable claim of ineffective assistance. In some cases, it may be incompetent for trial counsel to fail to have a defendant examined by a medical expert, see *U.S. ex rel. Emerson v. Gramley*, 883 F. Supp. 225, 244 (N.D. Ill. 1995), aff'd, 91 F.3d 898 (7th Cir. 1996), but Henderson has not shown that, in his case, the medical expert's testimony would have made a difference. A medical expert could not conclusively establish who struck Henderson in the ear or even how he was struck. Additionally, any new medical evidence would have been rebutted by the contemporaneous testimony of the police officers, the assistant state's attorney, the post-interrogation photos, and the fact that Henderson had never complained earlier about the abuse. Under the circumstances, the district court did not abuse its discretion in refusing to permit this discovery.

## B.

During a pre-trial discussion of possible *voir dire* questions, Henderson's counsel told the judge that his client was prepared to waive his right to a jury for sentencing purposes. The questioning of Henderson proceeded as follows:

> COURT: If you are found guilty, there first has to be a hearing to determine whether or not you are eligible for the death penalty. There is [sic] a number of factors that enter into that and it is a decision I make as the judge. Assuming that you were eligible for the death penalty then there has to be a hearing by the same jury who decided guilt or innocence as to whether or not that penalty is appropriate for you as an individual pertaining to this crime and the other factors that I'm sure you

have gone over with your lawyer. Do you understand all that?

HENDERSON:    Yes.

COURT: You have a right to have a jury determine that or you can have the judge determine that, in this case that would be me. Do you understand that?

HENDERSON:    Yes.

COURT: If you make a decision to have me decide it and not the jury then at this point the jury just decides your guilt or innocence and that is the last thing the jury does, they go home and they don't make any other decisions. Do you understand that?

HENDERSON:    Yes.

COURT:  And then I would make the other decision in the case regarding the second and third stage I told you about. Okay? Do you understand that?

HENDERSON:    Yes, sir.

COURT:  And your lawyer has just told me that it is your decision at this point not to have a jury decide whether or not the death penalty is appropriate if, in fact, we get to that part of the case. Is that correct?

HENDERSON:    Yes.

COURT:  And you would rather have me decide that rather than a jury, is that right?

HENDERSON:    Yes

* * *

COURT: Mr. Linn [defense counsel], do you feel that your client understands sufficient to make this decision with you?

MR. LINN:   Yes

COURT:  Mr. Henderson, I will ask you one more time, should we get to the point where the State is requesting a hearing as to whether the death penalty is appropriate, do you want me to hear it rather than twelve people from the community?

HENDERSON:   Yes, I do.

Henderson then signed a written waiver stating that "I hereby waive my right to have a Jury determine whether the Death Penalty should be imposed." As already mentioned, the judge, rather than a jury, ultimately determined Henderson's sentences.

In his appeal to the Illinois Supreme Court, Henderson argued that he did not knowingly and intelligently waive his right to have a sentencing jury because the trial judge incorrectly explained who would make the eligibility determination. The trial judge told Henderson that even if Henderson did not waive his right to a sentencing jury, he, the judge, would still make the eligibility determination.

Henderson is correct that Illinois law requires that the sentencing jury, if there is one, is the entity that determines eligibility for the death penalty. The Illinois Supreme Court agreed with him on this point and found that the judge had indeed made a misstatement. In spite of that mistake, however, the Illinois Supreme Court went on to find that Henderson's waiver was knowing and intelligent. It relied on a number of facts for that conclusion: Henderson consulted with his attorney; he said he understood the consequences of waiver; his attorney said that he thought Henderson's decision was made knowingly and intelligently; and finally, Henderson had already made his decision with his lawyer before the judge made the misstatement, and so his waiver decision probably was not based on the judge's misstatement of law. 568 N.E.2d at 1270-71.

Henderson also argued that his waiver was not know-ing and intelligent because the trial judge did not tell him that a jury's decision to sentence him to death would have to be unanimous. However, the Illinois Supreme Court has consistently held that failure to do this is not reversible error, see *People v. Buggs*, 493 N.E.2d 332 (Ill. 1986), *People v. Albanese*, 473 N.E.2d 1246 (Ill. 1984), and Henderson gave the court no reason to reconsider its earlier holdings. 568 N.E.2d at 1271.

In his § 2254 petition, Henderson argued that the court's decision that the waiver was voluntary and knowing was "contrary to" *Brady v. United States*, 397 U.S. 742, 748 (1970) (waivers "not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences") and *Adams v. U.S. ex rel. McCann*, 317 U.S. 269, 279 (1942) (accused can only waive constitutional rights "if he knows what he is doing and his choice is made with eyes open").

These cases and others establish the broad proposition that any waiver must be knowing and voluntary, but they do not deal with the narrow issue of whether a misstate-ment about the eligibility determination or failure to inform a capital defendant about the "one juror rule" makes a waiver invalid. Our task is to decide whether the Illinois Supreme Court's decision was an unreasonable application of cases like *Brady* and *McCann*. We find that it was not.

The Illinois Death Penalty Statute affords capital defen-dants the absolute right to a jury for sentencing unless the defendant waives that right. Ill. Rev. Stat 1983, Ch. 38, sec. 9-1(d). If the defendant does not waive his right to a jury, the jury, not the judge, determines eligibility. *Id*. at sec. 9-1(g). Henderson argues that his waiver of a sentencing jury was not made knowingly since the judge misinformed him about the jury's role in the eligibility phase of his death

penalty hearing. The Illinois Supreme Court found this argument for the reasons we have already described.

We agree with the state court that Henderson cannot establish a link between the misstatement regarding the eligibility determination and his decision to waive his right. Not only was the decision seemingly made before the judge made his misstatement, but also, as the district court noted, Henderson's eligibility for the death penalty was a foregone conclusion—he was over 18 at the time of the murder and he committed the murder in the course of another felony (kidnapping and rape). The only way the jury could have found that Henderson was not eligible for the death penalty was if it had disregarded the governing legal standards. Henderson has no right to such jury nullification. *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996).

Henderson's reliance on his alleged lack of knowledge about the "one juror" rule in the Illinois Death Penalty Statute fails for another reason. That rule requires jurors to agree unanimously before they may impose the death penalty *(Id.* at sec. 9-1(g)). If the jury does not unanimously agree, a term of imprisonment must be imposed by the court. *Id.* This court has issued opinions recognizing the importance of a defendant's knowledge of the unanimity requirement, see *Hall v. Washington*, 106 F.3d 742, 752-53 (7th Cir. 1997) (attorney's failure to inform his client about the one juror rule can contribute to a finding of ineffective assistance of counsel) and *St. Pierre v. Cowan*, 217 F.3d 939, 951 (7th Cir. 2000) (waiver can be invalidated if a judge affirmatively misinforms a defendant about the one juror rule). As a practical matter, we suspect that the unanimity requirement is perhaps the most important factor a defendant should consider before waiving his right to a sentencing jury. After all, intuition suggests that a chance at persuading one out of twelve people to recommend mercy will often be better than a chance to persuade one out of

one. Nevertheless, the United States Supreme Court has never ruled that a judge must make a capital defendant aware of the one juror rule, and has in fact denied certiorari in cases in which state supreme courts have determined that a waiver was valid even when a capital defendant was not told about the unanimity requirement. See *Jells v. Ohio*, 498 U.S. 1111 (1991); *Robertson v. California*, 493 U.S. 879 (1989). Until the Court does so, and makes such a ruling applicable to cases on collateral review, this argument cannot succeed.

## IV

For these reasons, we AFFIRM the judgment of the district court in its entirety. Specifically, we affirm the grant of the writ of habeas corpus, unless the State chooses within 120 days of the mandate of this court to seek a *Batson* hearing in the state court.

COFFEY, *Circuit Judge*, concurring.

## I.

I concur with the majority's holding that while it is not the trial court's *obligation to search* for evidence suggesting that the State struck potential jurors on the basis of race, the trial court also may not *refuse to consider* evidence proffered by a defendant attempting to raise a *prima facie* case of discrimination in the jury selection process. Thus, I agree with the majority's statement that in the extraordinary case when a defendant "request[s] a comparison an-

alysis and provide[s] the court with all of the relevant characteristics of the excluded and accepted venire members," the trial court may not "exclude from the *prima facie* case an entire category of evidence that has the potential to throw light on the question of intentional discrimination." *Ante* at 11.

However, I am unable to join the majority's expression of "concern with the Illinois Supreme Court's statement . . . that the fact that the victim was of the same race as the defendant tended to preclude a finding of purposeful discrimination" in this case. *Ante* at 14. I believe that whenever a *Batson* hearing takes place, one of the many relevant factors in the analysis of whether the State engaged in intentional discrimination must include whether the stricken venirepersons were of the same race as the defendant and the victim.[1]

I condemn racism, as do most other people worthy of being called citizens of this great country, and I believe it is the duty of the trial judge to ensure that the jury selection process is free of any hint of racism and/or prejudice. At the same time, I feel strongly that appellate courts should exercise great restraint and avoid interfering with the trial judge's ultimate determination—based upon the court record and upon the judge's observations, judgment, and life experiences—of whether there has been a *Batson* violation in any given case.

---

[1] *See, e.g., Simmons v. Beyer*, 44 F.3d 1160, 1167 (3d Cir. 1995); *Valdez v. People*, 966 P.2d 587, 595 n.17 (Col. 1998); *Jefferson v. United States*, 631 A.2d 13, 23 n.7 (D.C. 1993) (Rogers, C.J., dissenting); *State v. Duncan*, 802 So.2d 533, 552 (La. 2001); *Stanley v. State*, 542 A.2d 1267, 1277 n.11 (Md. 1988); *Mack v. State*, 650 So.2d 1289, 1298 (Miss. 1994); *State v. King*, 546 S.E.2d 575, 586 (N.C. 2001); *Commonwealth v. Hill*, 727 A.2d 578, 583 (Pa. 1999); *State v. Evans*, 998 P.2d 373, 381 (Wash. Ct. App. 2000).

When *Batson* hearings are held in cases dealing with a black defendant and a black victim, the trial judge may very well doubt that the prosecutor was striking black venirepersons on the basis of their race. The vast majority of counsellors I have dealt with, whether for the defense or the prosecution, are upstanding, conscientious public servants who take seriously their obligations under *Batson v. Kentucky*, 476 U.S. 79 (1986), and believe that men and women of all races are equally able to evaluate cases in an impartial manner based solely on the evidence presented to them. If the judge has knowledge of or is advised by some other reliable source that the prosecutor believes that race is an irrelevant factor, then the judge might be more likely to believe that the prosecutor's proffered race-neutral reason for striking an individual black venireperson is truthful. Thereafter, upon review of the entire record and based upon his or her knowledge and observations, the trial judge may rule that the defendant has failed to carry his burden of establishing a constitutional violation.[2] Thus,

---

[2] *See, e.g.*, *United States v. Marin*, 7 F.3d 679, 686 n.4 (7th Cir. 1993); *United States v. Causey*, 185 F.3d 407, 412-13 (5th Cir. 1999); *Mack*, 650 So.2d at 1298; *see also Georgia v. McCollum*, 505 U.S. 42, 60-61 (1992) (Thomas, J., concurring).

Indeed, some social science research indicates that black jurors are, in fact, more likely than members of other races to convict black defendants in cases involving black victims. *See, e.g.*, D.C. Ugwuegbu, *Racial and Evidential Factors in Juror Attribution of Legal Responsibility*, 15 J. EXPTL. SOC. PSYCH. 133 (1979); M. Miller & J. Hewitt, *Conviction of a Defendant as a Function of Juror-Victim Racial Similarity*, 105 J. SOC. PSYCH. 159 (1978); *see also* C. Lee, *Race and the Victim*, 73 CHI.-KENT L. REV. 533, 545-46 (1998); D.A. Clay, *Race and Perception in the Courtroom*, 67 TUL. L. REV. 2335, 2353 (1993). Because no rational prosecutor would strike venirepersons who he believes are sympathetic to his case, it is reasonable for a trial judge to believe that a prosecutor would

(continued...)

I believe, unlike the majority, "that the fact that the victim was of the same race as the defendant" may, indeed, "tend[ ] to preclude a finding of purposeful discrimination by the prosecution," provided that this fact is considered along with all the other facts and evidence in the record. *See id.* at 96-98.

## II.

I also wish to comment on the value of the statistical evidence proffered by Henderson in an effort to establish discrimination in the jury selection process in this case. According to Henderson, his statistics demonstrate that the Government used peremptory challenges to strike more blacks from the venire panel than similarly-situated whites. Although the majority states, on the one hand, that "we are not actually making a finding that this evidence supports a finding of discrimination," the majority goes on to state that "after proper analysis, [Henderson's] statistics *might support* a finding of race discrimination" and that "such a finding would be appropriate *only after a proper statistical analysis.*" *Ante* at 13. I write separately to point out and make clear that this present record is <u>barren of any evidence</u> except Henderson's statistics and that the trial judge should not rely solely on statistical evidence, standing alone without consideration of all the other facts and circumstances in the record, to find discrimination. Statistical evidence must always be considered along with all the other materials in the record and may not be given controlling weight as a matter of law.

I well remember Mark Twain's adage (which was later repeated in *Griffin v. Board of Regents*, 795 F.2d 1281 (7th

---

(...continued)

not strike black venirepersons in cases involving a black defendant and a black victim.

Cir. 1986)) that "[t]here are three kinds of lies—lies, damned lies and statistics." *Id.* at 1289. Statistics may be, and frequently are, very helpful and trustworthy when properly calculated and properly applied to the situation at hand along with all of the other evidence in the record. However, when viewed in isolation without proper consideration of the entire record, a statistical comparison illustrating the prosecutor's use of peremptory challenges against "similarly-situated" black and white venirepersons is of little value, for the statistics may fail to account for "the variety of factors and considerations that go into a lawyer's decision to select certain jurors while challenging others that appear to be similar." *People v. Johnson*, 767 P.2d 1047, 1056 (Cal. 1989). Some of the myriad of potential factors for striking potential jurors might include not merely whether the juror has a prior police record but also the severity of the criminal history; not only whether the juror was a victim of crime but also the nature of the crime and the date of the event; not only whether the juror's family has had prior contacts with law enforcement officers or attorneys, but also the nature and number of those contacts as well as the quality of the friendly and unfriendly relationship between the venireperson and the relative involved and law enforcement officer involved.

"Trial lawyers recognize that it is a *combination of factors rather than any single one* which often leads to the exercise of a peremptory challenge. In addition, *the particular combination or mix of jurors which a lawyer seeks may, and often does, change* as certain jurors are removed or seated in the jury box." *Id.* Thus:

> It may be acceptable, for example, to have one juror with a particular point of view but unacceptable to have more than one with that view. If the panel as seated appears to contain a sufficient number of jurors who appear strong-willed and favorable to a lawyer's position, the lawyer might be satisfied with a jury that

includes one or more passive or timid appearing jurors. *However, if one or more of the supposed favorable or strong jurors is excused either for cause or peremptory challenge and the replacement jurors appear to be passive or timid types, it would not be unusual or unreasonable for the lawyer to peremptorily challenge one of these apparently less favorable jurors even though other similar types remain.* These same considerations apply when considering the age, education, training, employment, prior jury service, and experience of the prospective jurors.

*It is also common knowledge among trial lawyers that the same factors used in evaluating a juror may be given different weight depending on the number of peremptory challenges the lawyer has at the time of the exercise of the particular challenge and the number of challenges remaining with the other side.* Near the end of the voir dire process a lawyer will naturally be more cautious about "spending" his increasingly precious peremptory challenges. Thus at the beginning of voir dire the lawyer may exercise his challenges freely against a person who has had a minor adverse police contact and later be more hesitant with his challenges on that ground for fear that if he exhausts them too soon, he may be forced to go to trial with a juror who exhibits an even stronger bias. Moreover, as the number of challenges decreases, a lawyer necessarily evaluates whether the prospective jurors remaining in the courtroom appear to be better or worse than those who are seated. If they appear better, he may elect to excuse a previously passed juror hoping to draw an even better juror from the remaining panel.

*Id.* at 1056-57.

It should be apparent, therefore, that the very dynamics of the jury selection process make it difficult, if not impossi-

ble, to focus exclusively on statistics when comparing the peremptory challenge of one juror with the retention of another juror who on paper appears to be substantially similar. I make this point for I trust that the Illinois state courts will not be left with the misconception that Henderson's statistical evidence, standing alone, will necessarily support a finding that the State discriminated in the jury selection process.

We must never forget that "a trial lawyer's judgments about a juror's sympathies are sometimes based on experienced hunches and educated guesses derived from a juror's responses at voir dire or a juror's 'bare looks and gestures.'" *J.E.B. v. Alabama*, 511 U.S. 127, 148 (1994) (O'Connor, J., concurring). The trial judge normally determines whether an improper factor motivated a lawyer's use of a peremptory challenge not by looking at statistics alone but by judging the lawyer's credibility. *See Marin*, 7 F.3d at 686 (quoting *United States v. Williams*, 934 F.2d 847, 849 (7th Cir. 1991)). As we have previously stated:

> A trial judge develops an intuitive sense for evaluating the actions played out in the courtroom. An evaluation—such as determining credibility—is often difficult to make from reviewing a written transcript (or even viewing a video replay). It is the trial judge's sensory perceptions of what occurs during the course of a case, combined with an understanding of the bar and the public gained from experience in the community served by the court, which provides the trial judge with a unique insight [into the question of discrimination].

*Id.*; *see also J.E.B.*, 511 U.S. at 158 (Scalia, J., dissenting) ("I am less inclined to demand statistics, and more inclined to credit the perceptions of experienced litigators who have had money on the line.").

Having made these observations, I concur in the majority opinion.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*